# Exhibit A

RECEIVED

MAR 16 2018

STAMP VALERIE WYANT
Clerk of the Superior Court
RETURN

Kathryn G. Mahady (28916)
**ASPEY WATKINS & DIESEL, PLLC**
123 N. San Francisco Street, 3rd Floor
Flagstaff, Arizona 86001
Telephone: (928) 774-1478
Email: KMahady@awdlaw.com
*Attorney for Petitioner*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF COCONINO

| | |
|---|---|
| Guillermo Tenorio-Serrano, as an individual, and on behalf of all others similarly situated, | Case No. CV2018001414 |
| Petitioner, | CLASS ACTION COMPLAINT |
| v. | **VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND SPECIAL ACTION** |
| James Driscoll, Coconino County Sheriff; Matt Figueroa, Jail Commander of the Coconino County Jail; Matt Ryan, member of the Board of Directors of the Coconino County Jail District; Lena Fowler, member of the Board of Directors of the Coconino County Jail District; Jim Parks, member of the Board of Directors of the Coconino County Jail District; Elizabeth Archuleta, member of the Board of Directors of the Coconino County Jail District; Art Babbott, member of the Board of Directors of the Coconino County Jail District, all in their official capacities, | |
| Respondents. | |

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

## PETITION FOR SPECIAL ACTION & COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1. Pursuant to policy of the Coconino County Sheriff's Office's ("CCSO"), Coconino County will prolong the jail time of inmates suspected of residing in the United States without lawful immigration status, even if Coconino County lacks any state law basis for continued detention.

2. Petitioner Guillermo Tenorio-Serrano ("Petitioner" or "Tenorio-Serrano") was arrested on December 11, 2017 for alleged misdemeanor violations of A.R.S. § 28-1381(A)(1), (2) and § 28-1382(A)(1), (2) (driving under the influence of alcohol).

3. On December 12, 2017, the Flagstaff Justice Court set Petitioner's bond at $2,000.

4. Several individuals have attempted to post bond on Petitioner's behalf since December 12, 2017.

5. Despite numerous individuals being willing to post bond for Tenorio-Serrano, Petitioner remains detained in the Coconino County Detention Facility ("CCDF") due to CCDF's unconstitutional policy of prolonging detention of inmates for whom it receives a "detainer" from the U.S. Immigration and Customs Enforcement agency ("ICE").

6. CCDF's policy violates Article II, Section 8 of the Arizona Constitution and the Fourth and Fourteenth Amendments to the U.S. Constitution by requiring Mr.

1  Tenorio-Serrano to remain in jail after meeting all conditions for pre-trial release,

2  without any independent probable cause determination that Mr. Tenorio-Serrano has

3  committed an additional crime, and without any recognized exception to the Warrant

4  Clause of the Fourth Amendment to the U.S. Constitution.

5  **JURISDICTION AND VENUE**

6     7.  This Complaint raises a Special Action pursuant to the Arizona Rules of

7  Procedure for Special Actions, the predecessor to which, Article VI, § 18 of the

8  Arizona Constitution and A.R.S. § 12-2021 (Writ of Mandamus), authorized this

9  Court to hear.

10     8.  Special Action is appropriate because there is no equally plain, speedy, and

11  adequate remedy available to Petitioner.

12     9.  Special Action is appropriate because Petitioner seeks an Order from this

13  Court requiring Respondents to perform a duty:

14      a.  Ministerial in nature; and

15      b.  The law specially imposes as a duty resulting from the Respondents' offices; and

16

17      c.  Respondents have thus far refused to perform; and

18      d.  About which Respondents have no discretion. Ariz. R. Spec. Act. P. 3(a).

19    10. Special Action is also appropriate because Respondents are acting without

20  legal authority. Ariz. R. Spec. Act. P. 3(b).

21    11. This complaint seeks injunctive relief, as authorized by A.R.S. § 12-1801.

- 3 -

1    12. This complaint seeks declaratory relief, as authorized by A.R.S. § 12-1831.

2    13. The provisions of A.R.S. § 12-821.01 do not apply to this action because

3    Petitioner raises no claim for monetary damages against any Respondent and all

4    prayers for relief are exclusively injunctive, declaratory, or extraordinary.

5    14. Venue is proper in this Court because Petitioner is currently detained within

6    Coconino County, Petitioner resides in Coconino County, Petitioner is in the custody

7    of the Coconino County Sheriff, the public body and public officials who

8    determined the matter to be reviewed in this action are officials of Coconino County,

9    and a substantial part of the events or omissions giving rise to this claim occurred in

10   Coconino County.

11                                              **PARTIES**

12   15. Petitioner Guillermo Tenorio-Serrano is a resident of Coconino County,

13   Arizona.

14   16. Petitioner is currently held as a pre-trial detainee in CCDF, located at 951 E.

15   Sawmill Road in Flagstaff, Arizona.

16   17. Petitioner has been continuously held as a pre-trial detainee by the CCSO

17   since December 11, 2017.

18   18.  Respondent Jim Driscoll is the Coconino County Sheriff and has served as

19   the Coconino County Sheriff during all times relevant to this action. Mr. Driscoll is

20   sued in his official capacity.

21

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

19. Mr. Driscoll's duties include taking charge of and keeping CCDF, pursuant to A.R.S. §§ 11-441(A)(5) and 48-4002(F).

20. Respondent Matt Figueroa is an employee of CCSO and serves as the Jail Commander of CCDF. Mr. Figueroa is sued in his official capacity.

21. Upon information and belief, Respondent Jim Driscoll has delegated to Respondent Matt Figueroa the authority to formulate jail policy.

22. Upon information and belief, Respondent Matt Figueroa drafted the current version of the jail policy that implements the constitutional violations addressed in this action.

23. Upon information and belief, Respondent Matt Figueroa is responsible for overseeing the day-to-day operations of CCDF.

24. Upon information and belief, Respondent Matt Figueroa has supervisorial responsibility over all civilian CCSO employees working at CCDF, including those civilian employees responsible for accepting and/or processing bail.

25. The Coconino County Jail District ("Jail District") is a political subdivision of the State of Arizona. It is organized and established to provide in-custody detention and inmate-correctional housing in the CCDF pursuant to A.R.S. § 48-4001, *et seq.*

26. The Jail District is overseen and operated by the CCSO and the Coconino County Board of Supervisors. The County Board of Supervisors serves as the Board of Directors of the Jail District. *See* A.R.S. § 48-4002.

- 5 -

27. Respondent Matt Ryan is the chairman of the Coconino County Board of Supervisors and a member of the Board of Directors for the Jail District. Mr. Ryan is sued in his official capacity.

28. Respondent Lena Fowler is vice-chair of the Coconino County Board of Supervisors and a member of the Board of Directors for the Jail District. Ms. Fowler is sued in her official capacity.

29. Respondent Elizabeth Archuleta is a member of the Coconino County Board of Supervisors and a member of the Board of Directors for the Jail District. Ms. Archuleta is sued in her official capacity.

30. Respondent Art Babbott is a member of the Coconino County Board of Supervisors and a member of the Board of Directors for the Jail District. Mr. Babbott is sued in his official capacity.

31. Respondent Jim Parks is a member of the Coconino County Board of Supervisors and a member of the Board of Directors for the Jail District. Mr. Parks is sued in his official capacity.

## GENERAL ALLEGATIONS

### I. CCSO's 2017 Jail Policy

32. Upon information and belief, the CCSO has had in place since at least January 2008 a written policy setting out the appropriate steps for jail staff to follow when encountering a CCDF inmate suspected of being in the United States without lawful immigration status.

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

33. On July 28, 2017, CCSO issued a revised version of this jail policy, entitled "Suspected Illegal Immigrant Inmates" ("2017 Jail Policy"). A copy of this 2017 Jail Policy is attached as Exhibit "A."

34. The 2017 Jail Policy became effective on July 28, 2017 and remains in place to this date.

35. The 2017 Jail Policy controls the ongoing detention of Mr. Tenorio-Serrano.

36. The 2017 Jail Policy instructs CCDF staff to allow inmates with "ICE detainers" (also referred to as "ICE holds") to "post bond on their local charges." Exhibit A.

37. However, the 2017 Jail Policy also instructs staff that such inmates "will remain in custody" until either: 1) ICE provides notice it has dropped its detainer; 2) ICE takes custody of the inmate; or 3) ICE fails to take custody of the inmate within forty-eight hours of a defendant posting bond. Exhibit A.

38. The 2017 Jail Policy instructs CCSO personnel to prolong detention of a subset of pre-trial detainees beyond the time CCSO would otherwise hold them, on the exclusive basis of receipt of an "ICE detainer" and an accompanying "ICE administrative warrant." Exhibit A.

## II. Communication with Respondents Regarding the 2017 Jail Policy's Unconstitutionality

39. On September 19, 2017, Mik Jordahl, the Coconino County Inmate Civil Rights Advising Attorney, communicated with County Attorney Bill Ring and Respondent Matt Figueroa expressing concerns about CCDF's practice of

- 7 -

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

1  prolonging detention of pre-trial detainees for ICE detainers. A copy of this

2  communication is attached as Exhibit B.

3    40. Mr. Jordahl indicated "there may be some significant liabilities to the County

4  and the Jail District to holding a person without a court order, even for a matter of

5  hours after they otherwise would have been released." Exhibit B.

6    41. On September 28, 2017, the ACLU of Arizona sent a twelve-page letter to

7  Respondent Jim Driscoll and other officers of Coconino County outlining the

8  constitutional concerns with the 2017 Jail Policy. A copy of this letter is attached as

9  Exhibit C.

10    42. The letter provided Respondent Jim Driscoll with no fewer than ten case

11  citations from federal district courts and federal circuit courts indicating several

12  provisions of the 2017 Jail Policy were unconstitutional. Exhibit C.

13    43. The ACLU's letter informed Respondents that at least two (2) federal district

14  court cases within the Ninth Circuit have struck down as unconstitutional jail

15  practices similar to Coconino County's 2017 Jail Policy. Exhibit C, p.3, 5; *Ochoa v.*

16  *Campbell*, 2017 WL 3476777 (E.D. Wash. July 31, 2017); *Miranda-Olivares v.*

17  *Clackamas Cty.*, 2014 WL 1414305 (D. Or. April 11, 2014).

18    44. Upon information and belief, Respondent Jim Driscoll and Coconino County

19  Attorney Bill Ring received the ACLU's letter on or about September 30, 2017.

20

21

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

45. In October 2017, a group of concerned citizens met with Respondent Jim Driscoll and County Attorney Bill Ring to express their concerns about the 2017 Jail Policy.

46. In December 2017 a group of concerned citizens met again with County Attorney Bill Ring to reiterate their concerns about the 2017 Jail Policy.

47. On February 27, 2018, at least six residents of Coconino County appeared before the regularly-scheduled meeting of the Coconino County Board of Supervisors to bring to their attention the constitutional violations of the 2017 Jail Policy. All five members of the Coconino County Board of Supervisors were in attendance during this meeting.

48. As outlined above, Respondent Jim Driscoll, both directly and indirectly through his attorney Bill Ring, was aware of the constitutional violations of the 2017 Jail Policy during all times relevant to this action.

49. Respondents continue to refuse to revise or replace the 2017 Jail Policy.

50. As outlined above, Mr. Tenorio-Serrano's constitutional right to secure prompt release from CCDF upon satisfaction of all local conditions of release was clearly established as of December 12, 2017, the day the Flagstaff Justice Court set a bond in his criminal case.

III. **Mr. Tenorio-Serrano's Initial Arrest and Detention**

51. Tenorio-Serrano was arrested by Flagstaff Police on December 11, 2017 and charged with four criminal counts related to driving while under the influence.

52. All four criminal counts cited in Paragraph Two, above, are alleged violations of Arizona criminal statutes.

53. On December 11, 2017, Tenorio-Serrano was booked into CCDF on the local charges described above.

54. At no time did Coconino County officials bring federal criminal charges against Tenorio-Serrano.

55. At no time since December 11, 2017 have federal authorities brought federal criminal charges against Tenorio-Serrano.

56. Upon information and belief, at no time since December 11, 2017 have federal authorities communicated to CCSO personnel that there is probable cause to believe that Tenorio-Serrano has violated any federal criminal laws.

57. Upon information and belief, there are no outstanding criminal warrants from other jurisdictions for Tenorio-Serrano's arrest.

58. Upon information and belief, during all times relevant to this action, no federal or state official has established probable cause to believe Tenorio-Serrano has violated a federal criminal statute.

**IV. ICE Involvement in Mr. Tenorio-Serrano's Case**

59. On or about December 12, 2017, ICE officials in Phoenix, Arizona became aware Tenorio-Serrano was in the custody of CCSO.

60. On December 12, 2017, ICE officials in Phoenix, Arizona faxed two documents to CCDF related to Tenorio-Serrano: one document entitled "Department

- 10 -

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

of Homeland Security Immigration Detainer – Notice of Action" and imprinted with the form number "I-247A," and a second document entitled "U.S. Department of Homeland Security Warrant for Arrest of Alien" and imprinted with the form number "I-200." Both documents are standard ICE forms and are attached as Exhibit D.

61. Aside from the two documents referenced above, CCSO received no other documents from ICE related to Petitioner Tenorio-Serrano.

**A. Form I-247A: ICE Detainer Request**

62. Form I-247A provided to CCDF on December 12, 2017 states ICE has determined that there exists "probable cause" to believe that Mr. Tenorio-Serrano is "a removable alien". Exhibit D.

63. Form I-247A nowhere indicates that ICE has established probable cause to believe that Mr. Tenorio-Serrano violated any criminal laws.

64. Nowhere on Form I-247A appear the words "misdemeanor" or "felony."

65. Form I-247A is signed by an ICE "deportation officer" with the surname Wagstaff.

66. Officer Wagstaff is an employee of ICE, which is a federal law enforcement agency.

67. Officer Wagstaff is a federal law enforcement officer.

68. Officer Wagstaff, at the time he or she prepared the Form I-247A at issue in this action, was acting as a law enforcement officer employed by ICE.

69. Officer Wagstaff, at the time he or she prepared the Form I-247A at issue in this action, was not acting as a "neutral and detached magistrate," as defined in Fourth Amendment jurisprudence.

**B. Form I-200: ICE Administrative Warrant**

70. Form I-200 is titled a "warrant for arrest of alien" and was signed by Barry Jansen, an "authorized immigration officer" employed by ICE. Exhibit D.

71. Form I-200 is addressed to "any immigration officer authorized pursuant to Sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations." Exhibit D.

72. Neither CCDF nor CCSO employs anyone who meets the criteria of "any immigration officer authorized pursuant to Sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations." Exhibit D.

73. Upon information and belief, at all times relevant to this action, there have been no other state or federal law enforcement officers who meet the criteria described above stationed at CCDF, or otherwise authorized to perform functions on behalf of CCSO

74. Neither CCSO nor CCDF participate in the federal program known as "287(g)," which authorizes local law enforcement officers of participating agencies to perform certain immigration-related tasks.

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

1    75. Form I-200 does not articulate any reasonable suspicion or probable cause to

2    believe Mr. Tenorio-Serrano violated any criminal laws.

3    76. Neither the word "misdemeanor" nor the word "felony" appear anywhere on

4    the standard Form I-200 provided to CCDF.

5    77. Barry Jansen, whose signature appears on the Form I-200 provided to CCDF,

6    is a federal law enforcement officer and an employee of ICE.

7    78. Barry Jansen, at the time he signed the Form I-200, was not acting as a

8    "neutral and detached magistrate," as that term is defined by Fourth Amendment

9    jurisprudence.

10   79. Form I-200 was not signed by a judge.

11   80. Form I-200 was not signed by an employee of the judicial branch at either the

12   state or federal level.

13   81. Form I-200 was not signed by an administrative law judge.

14   82. Form I-200 was issued by an executive official involved in the investigation

15   of Mr. Tenorio-Serrano's immigration status.

16   83. Form I-200 was not supported by the oath or affirmation of any government

17   official, neutral or otherwise.

18   84. ICE has admitted in public court filings in other lawsuits that "ICE's detainer

19   policy does not require its agents to obtain a determination of probable cause from a

20   detached and neutral magistrate." *See Jimenez-Moreno v. Johnson*, 1:11-cv-05452

21   (N.D. Ill.), Dk. #219 (Feb. 9, 2016).

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

85. Form I-200 states probable cause was founded upon "statements made voluntarily by the subject to an immigration officer and/or other reliable evidence" but does not indicate which of the two (or both) purportedly establishes probable cause in this instance.

86. ICE has a well-documented history of unreliability in determining which jail inmates may be subject to removal. For example, between 2003 and 2015, ICE issued detainers to CCSO on three occasions for individuals who were later proven to be U.S. citizens and not deportable. During the same time period, ICE issued detainers to the Maricopa County Sheriff's Office 265 times for individuals later proven to be U.S. citizens.[1]

87. According to public court filings in other litigation, ICE "acknowledges there are 'big gaps' in CIS naturalization information," one of the key databases ICE personnel must consult prior to deciding whether there is probable cause to believe a jail inmate is removable. *See, e.g., Roy, et al. v. County of Los Angeles, et al.*, 2:12-cv-09012 (C.D. Cali.), Dk. #278 (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment). A copy of this document is attached as Exhibit E.

88. ICE itself estimates that two of the immigration-related databases it frequently consults to make determinations of probable cause produce errors approximately 30% of the time. *Id.*

---

[1] Data from FOIA requests submitted to ICE: http://trac.syr.edu/phptools/immigration/detain/

89. During all times relevant to this action, Respondent Jim Driscoll knew or should have known of these inadequacies within ICE's system for making probable cause determinations, as many of these details were pointed out to him in the September 28, 2017 letter attached as Exhibit C.

90. At all times relevant to this action, Respondent Jim Driscoll knew or should have known CCSO has no constitutional authority to continue Petitioner Tenorio-Serrano's detention for up to forty-eight additional hours after receiving cash bail on Petitioner Tenorio-Serrano's local charges, due to the facts asserted above.

91. At all times relevant to this action, Respondent Jim Driscoll knew or should have known his agency bears independent legal responsibility for ensuring it is detaining jail inmates in a lawful manner and that his agency cannot hide behind representations or requests made by a federal law enforcement agency.

## V. **CCSO's Detention of Mr. Tenorio-Serrano**

92. On December 12, 2017, the Flagstaff Justice Court set bail on Tenorio-Serrano's misdemeanor charges in the amount of $2,000. A copy of these release conditions is attached as Exhibit F.

93. The Flagstaff Justice Court derived its authority to set conditions of release from A.R.S. § 13-3967 and from Article II, Section 22 of the Arizona Constitution, as Tenorio-Serrano is a pre-trial detainee facing state misdemeanor charges within the Flagstaff Justice Court's jurisdiction.

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

1  94. The $2,000 bail was the only condition of release the Flagstaff Justice Court

2  set. Exhibit F.

3  95. The Release Conditions attached as Exhibit F are still in force at this time and

4  have not been rescinded, modified, superseded or otherwise amended since the

5  initial issuance on December 12, 2017.

6  96. On December 12, 2017, just hours after the Flagstaff Justice Court set bail on

7  the local charges, Ms. Sarai Tenorio-Serrano visited CCDF to inquire whether

8  Petitioner would be released upon payment of the $2,000 bail. An Affidavit from

9  Ms. Tenorio-Serrano is attached as Exhibit G.

10  97. The on-duty CCSO jail employee informed Ms. Tenorio-Serrano that

11  Petitioner was indeed being held on $2,000 bail but that payment of such bail would

12  not result in Petitioner's release into the community due to the existence of an "ICE

13  detainer." Exhibit G.

14  98. On December 15, 2017, Mr. Joseph Cabell Breckinridge attempted to post

15  cash bail on behalf of Petitioner at CCDF with a personal credit card that had more

16  than $2,000 in available credit. An Affidavit from Mr. Breckinridge is attached as

17  Exhibit H.

18  99. Prior to tendering his personal credit card, Mr. Breckinridge verbally

19  confirmed with the CCSO employee on duty that Petitioner was being held as a pre-

20  trial detainee on $2,000 bail. Exhibit H.

21

ASPEY, WATKINS & DIESEL, P.L.C
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

- 16 -

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

100.     The on-duty CCSO employee informed Mr. Breckinridge that it was typically the practice of CCSO to "immediately" release a pre-trial detainee upon receipt of the requisite bail amount. Exhibit H.

101.     Upon information and belief, it is typical practice for CCSO to release pre-trial detainees within one hour of the requisite bail being received on the detainee's behalf.  In other words, upon information and belief, "immediate," for CCSO release purposes, means approximately one hour.

102.     After confirming Petitioner was being held on $2,000 cash bail and confirming CCSO's typical practice in such circumstances, the on-duty CCSO employee informed Mr. Breckinridge that Tenorio-Serrano would not be "immediately" released upon payment of the $2,000 bail. Exhibit H.

103.     The on-duty CCSO employee explained to Mr. Breckinridge that Petitioner would be held for up to an additional 48 hours after Mr. Breckinridge posted the bail. Exhibit H.

104.     The on-duty CCSO employee explained to Mr. Breckinridge that this additional delay was due exclusively to the existence of what the on-duty employee referred to as an "ICE hold." Exhibit H.

105.     The on-duty CCSO employee explained to Mr. Breckinridge that the additional delay in Tenorio-Serrano's release was in order to allow ICE sufficient time to take custody of Tenorio-Serrano. Exhibit H.

- 17 -

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

106.     Mr. Breckinridge would have tendered the full bail amount and completed the transaction on December 15, 2017, but for the verbal representations made by the on-duty CCSO employee. Exhibit H.

107.     The actions and representations made by the on-duty CCSO staff on December 12, 2017 and again on December 15, 2017 are consistent with the 2017 Jail Policy described above and attached as Exhibit A.

108.     Upon information and belief, the representations made by the on-duty CCSO staff on December 12, 2017 and again on December 15, 2017 are drawn from the 2017 Jail Policy.

109.     Absent the 2017 Jail Policy, Tenorio-Serrano would have been released from pre-trial detention no later than December 15, 2017.

110.     Petitioner Tenorio-Serrano has now been unlawfully detained by Respondents approximately twelve weeks longer than he would have if Respondents had processed his bail in a lawful manner.

## CLASS ACTION ALLEGATIONS

111.     Pursuant to Ariz. R. Civ. P. 23, Petitioner brings this class action and seeks certification of the claims and certain issues in this action on behalf of a Class defined as:

> All current and future pre-trial detainees of Coconino County Detention Facility who currently are or will be the subject(s) of an ICE detainer request sent to Respondents (except those pre-trial detainees not eligible for bail under Article II, Section 22 of the Arizona Constitution).

- 18 -

(Hereinafter, the "Class").

112.    Petitioner reserves the right to amend the Class definition if further investigation and discovery indicates the Class definition should be narrowed, expanded, or otherwise modified.

113.    Respondents' practices and omissions are being applied uniformly to all members of the Class.

114.    Absent relief granted by this Court, Petitioner believes all future members of the Class will be treated similarly to Petitioner and similarly to one another.

115.    All members of the Class are and will be similarly affected by the unconstitutional practices of Respondents.

116.    Based upon public records available at this time, it is apparent the number of Class members is so large as to make joinder impractical, if not impossible.

117.    The claims asserted by Petitioner in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Respondents, and the relief sought within the Class is common to the members of the Class.

118.    Petitioner will fairly and adequately represent and protect the interests of the members of the Class.

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

# COUNT 1

### Special Action Pursuant to A.R.S. § 12-2021
### and the Arizona Rules of Special Action

### (Respondents' violations of Article II, Section 8
### of the Arizona Constitution)

119.    Petitioner restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.    The allegations described above constitute violations of Petitioner's rights pursuant to Article II, Section 8 of the Arizona Constitution.

121.    Special Action is appropriate because there is no equally plain, speedy, and adequate remedy available to Petitioner.

122.    Special Action is appropriate because Petitioner seeks an Order from this Court requiring Respondents to perform a duty:

    a.  Ministerial in nature; and

    b.  The law specially imposes as a duty resulting from the Respondents' offices; and

    c.  Respondents have thus far refused to perform; and

    d.  About which Respondents have no discretion. Ariz. R. Spec. Act. P. 3(a).

123.    Special Action is also appropriate because Respondents are acting without legal authority. Ariz. R. Spec. Act. P. 3(b).

///

///

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

## COUNT 2

### Class Action

124.     Petitioner restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

125.     Tenorio-Serrano may sue as a representative party for the class of persons similarly situated.

126.     The class is so numerous that joinder of all members is impracticable.

127.     There are questions of law and fact common to the class.

128.     Tenorio-Serrano's claims are typical of the claims of the class.

129.     Tenorio-Serrano will fairly and adequately protect the interests of the class.

130.     Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and would establish incompatible standards of conduct for Respondents.

131.     Respondents have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate for the class as a whole.

132.     Undersigned counsel is an appropriate class counsel, pursuant to Rules 23(g)(1) and 23(g)(4), Ariz. R. Civ. P., as undersigned counsel is experienced in complex litigation, knowledgeable about the applicable law, has the resources to

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

1  commit to representing the class, and will fairly and adequately represent the

2  interests of the class.

3  **COUNT 3**

4  **(Injunctive Relief)**

5      133.      Petitioner restates and incorporate by reference the allegations

6  contained in the preceding paragraphs of this Complaint.

7      134.      The allegations described above constitute violations of Petitioner's

8  rights pursuant to the Fourth Amendment to the U.S. Constitution and Article II,

9  Section 8 of the Arizona Constitution.

10      135.      Petitioner can demonstrate both a likelihood of success on the merits

11  and a probability (not merely possibility) of irreparable harm if the Court does not

12  grant relief.

13      136.      Petitioner can show that there will be no hardship to Respondents if

14  relief is granted, and that Petitioner will suffer immeasurably if this Court does not

15  grant relief.

16  **COUNT 4**

17  **(Declaratory Relief)**

18      137.      Petitioner restates and incorporates by reference the allegations

19  contained in the preceding paragraphs of this Complaint.

20      138.      The allegations described above constitute violations of Petitioner's

21  rights pursuant to Article II, Section 8 of the Arizona Constitution.

- 22 -

1

**PRAYER FOR RELIEF**

2

3        WHEREFORE, Petitioner respectfully requests this Court enter judgment in

his favor and against Respondents, and award the following relief:

4
    A.  Certify this action as a class action, pursuant to Rule 23(b)(1) or 23(b)(2),
5
        Ariz. R. Civ. P.;
6
    B.  Issue an Order certifying this class action, pursuant to Rule 23(c)(1)(B), Ariz.
7
        R. Civ. P.;
8
    C.  Include in such Order an award of attorneys' fees and non-taxable costs,
9
        pursuant to Rule 23(g)(1)(D) and 23(h), Ariz. R. Civ. P.;
10
    D.  Appoint undersigned counsel as class counsel, pursuant to Rule 23(g), Ariz.
11
        R. Civ. P.;
12
    E.  Declare the provisions of Respondents' 2017 Jail Policy permitting CCSO
13
        employees to prolong detention of inmates at CCDF for up to 48 additional
14
        hours to allow ICE to take custody of the inmate are in violation of Article II,
15
        Section 8 of the Arizona Constitution, both facially and as applied to
16
        Petitioner;
17
    F.  Declare the Form I-200 provided to CCSO by ICE on December 12, 2017 is
18
        not sufficient to meet the requirements of Article II, Section 8 of the Arizona
19
        Constitution and the Warrant Clause of the Fourth Amendment to the U.S.
20
        Constitution;
21

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

- 23 -

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

G. Declare Form I-200 is not a lawful warrant upon which Respondents are entitled to rely;

H. Preliminarily and permanently enjoin Respondents, their officers, agents, servants, and employees from holding or otherwise detaining Petitioner more than sixty minutes beyond the moment CCSO receives the bail amount set by the Flagstaff Justice Court on December 12, 2017;

I. Accept jurisdiction of a special action by finding Petitioner has standing to bring a special action, the matter is subject to judicial review, and Petitioner properly pled Respondents' failure to perform a ministerial duty they were required by law to perform and properly pled that Respondents are acting without legal authority;

J. Order Respondents to show cause why Respondents should not be ordered by this Court to release Petitioner from CCDF immediately upon payment of Petitioner's bail, as the law requires Respondents to do and in which the law provides no discretion to Respondents;

K. Order Respondents to show cause why Respondents should not be ordered to release Petitioner from CCDF in a specific manner, as is permitted of the Superior Court in certain circumstances during Special Actions (*see, e.g., Tovrea v. Superior Court*, 101 Ariz. 295 (1966); *Southwest Forest Industries, Inc. v. Sullivan*, 100 Ariz. 336 (1966));

- 24 -

L. Pursuant to A.R.S. § 12-2028A, order Respondents to release Petitioner from their custody immediately upon receipt of the requisite bail amount, and do so no longer than sixty minutes from the moment Respondents receive the requisite bail amount and without invoking the 2017 Jail Policy's unconstitutional provisions, including communicating with ICE regarding Petitioner's release date and time;

M. Award Petitioner their costs and reasonable attorneys' fees in this action, pursuant to A.R.S. § 12-2030, Ariz. R. Civ. P. 23;

N. Grant Petitioner such other relief as this Court may deem just and proper.

DATED:  March 16, 2018.

ASPEY WATKINS & DIESEL, PLLC

Kathryn G. Mahady
*Attorney for Petitioner*

ORIGINAL of the foregoing filed
this 16th day of March 2018, with:

Clerk of Coconino County Superior Court
200 N. San Francisco St.
Flagstaff, AZ 86001

ASPEY, WATKINS & DIESEL, PLLC
123 N. San Francisco St., 3rd Floor
Flagstaff, AZ 86001
(928) 774-1478

## VERIFICATION

STATE OF ARIZONA     )

                         ) ss.

County of Coconino     )

GUILLERMO TENORIO SERRANO, being first duly sworn upon his oath, deposes and says:

1. I am named personally as a Petitioner in this matter.

2. I have reviewed the attached Complaint for Declaratory Relief, Injunctive Relief, and Special Action, and know the contents thereof, and the same are true and correct to the best of my knowledge, information and belief.

DATED            , 2018.



Guillermo Tenorio Serrano

SUBSCRIBED AND SWORN to before me this 15th day of March, 2018 by Guillermo Tenorio Serrano.

SARAH WILCE
Notary Public - Arizona
Coconino County
My Comm. Expires Mar 9, 2019

Notary Public

LAW OFFICES OF
ASPEY, WATKINS & DIESEL, PLLC
123 NORTH SAN FRANCISCO STREET, SUITE 300
FLAGSTAFF, ARIZONA 86001

# CERTIFICATE OF TRANSLATION

I, _Robert Neustadt_ , I am fluent in English

and Spanish; I have read to Petitioner Guillermo Tenorio-Serrrano the attached Complaint for

Declaratory Relief, Injunctive Relief, and Special Action; and he has confirmed to me that the

contents thereof are true to the best of his knowledge, information, and belief.


_Robert Neustadt_                        _Bob_ _~_

(translator's printed name)                    (translator's signature)


_03/15/2018_

(Date)


State of Arizona          )
                          )
County of Coconino        )


On this _15_ day of _March_ , 20_18_ ,

    (date)              (month)                                (year)

before me personally appeared _Robert Neustadt_ ,

                              (name of signer)

whose identity was proven to me, on the basis of satisfactory evidence, to be the person whom

he/she claims to be, and acknowledged to me that he/she did sign this certificate.


SARAH WILCE
Notary Public - Arizona
Coconino County
My Comm. Expires Mar 9, 2019

_Sarah Wilce_

Notary Public  (signature)

# EXHIBIT "A"

# EXHIBIT "A"

**COCONINO COUNTY SHERIFF'S OFFICE**
**Detention Facility Policy and Procedure**

| Topic<br>Suspected Illegal Immigrant Inmates | Effective Date<br>01/28/08 | P & P No. R1.1a<br>Page 1 of 2 |
|---|---|---|
| Subtopic<br>Holds/Detainers | Revised by<br>Commander Matt Figueroa<br>07/28/17 | Authorization<br>Commander Braatz |

## POLICY:

Detention Staff will notify the Detention and Removal Office (DRO), a subsidiary of Immigration Custom Enforcement (ICE), immediately upon reasonable suspicion, notification or admission that an inmate in our facility is an alien and is unlawfully present in the United States.

In determining whether reasonable suspicion of unlawful presence exists, officers should consider all relevant factors, including, among others:

- Lack of or false identification, no date of birth, no social security number
- Possession of foreign identification
- Voluntary statements by the person regarding their citizenship or lawful presence
- Prior information about the person
- Inability to provide their residential address
- Providing inconsistent or illogical information
- Demeanor – for example, unusual or unexplained nervousness, erratic behavior, refusal to make eye contact
- Significant difficulty speaking English

## PROCEDURE:

1. Detention Staff will notify the DRO immediately upon reasonable suspicion, notification or admission that an inmate in our facility is an alien and is unlawfully present in the United States.

2. Detention Staff will have the inmate in question speak to the DRO over the telephone.

3. If the DRO determines that the inmate in question is in fact in this country illegally, then the DRO/ICE will fax Immigration Detainer - Notice of Action form I-247A and either a Warrant for Arrest of Alien form I-200 or a Warrant of Removal/ Deportation form I-205 to be placed in the inmates file.

4. The bottom law enforcement agency portion of the Immigration Detainer – Notice of Action form I-247A will be filled out by our staff and faxed back to DRO/ICE.

5.    A photocopy of the Immigration Detainer – Notice of Action form I-247A and either a Warrant for Arrest of Alien form I-200 or a Warrant of Removal/ Deportation form I-205 notice will be given to the inmate.

6.    The ICE Tab within our Jail Management System (JMS) in ILEADS will be utilized by staff to document the ICE Detainer and other pertinent information regarding the inmate. Staff will also document the reasonable suspicion or reason why ICE was notified in the notes field within the ICE tab. A "Hold for ICE" will then be placed on the inmate in JMS.

7.    Inmates with an ICE Detainer will be allowed to post bond on their local charges.

8.    Detention Staff will call the DRO/ICE at (602)257-5911 and notify them all local charges have been adjudicated or the bond is posted. The Immigration Detainer – Notice of Action form I-247A in the inmate folder needs to be scanned and sent via email to phojailreleases@ice.dhs.gov or faxed to (602)379-4502 if an inmate is pending a release.

9.    Once ICE is notified, staff will write the inmates name and other pertinent information along with the potential release date on the dry erase board in the Intake/Court Office area. The same information will also be documented in the notes field in JMS.

10.    The detainer will remain in effect and the inmate will remain in custody until:

○   DRO/ICE advises and sends a Immigration Detainer – Notice of Action form I-247A release notifying the Detention Facility to remove or drop the detainer or,

○   ICE takes custody of the Illegal Immigrant inmate or,

○   Until the detainer period expires.

A.   The detainer period: The current legal detainer period shall not exceed 48 hours. The detainer period commences when the local or state criminal justice agency has no other legal basis for continuing the detention (e.g., when charges are dismissed, when bond is posted).

B.   The detainer period exists for the purpose of complying with a timely legal request for temporary detention issued by the Department of Homeland Security/ICE as noted above. In the event DHS/ICE fails to assume actual physical custody of the detainee within 48 hours of the onset of the federal detainer (including Saturdays, Sundays and holidays) the detainee must be released.

C.   In the event of release at the expiration of the detention period, the cause or reason for release shall be noted in the release comments in JMS.

# EXHIBIT "B"

# EXHIBIT "B"

 Gmail

## Fw: ICE DETAINER REQUESTS

**Mikkel Jordahl** <mikkeljordahl@yahoo.com>                              Tue, Sep 19, 2017 at 5:24 PM
To: Billy Peard <bpeard@acluaz.org>, Cabell Breckinridge <cabellbkft@gmail.com>

Just sent this to Jail Commander and County Attorney.  I'd appreciate if this correspondence was not released to anyone.  Thanks.  Mik

----- Forwarded Message -----
**From:** Mikkel Jordahl <mikkeljordahl@yahoo.com>
**To:** Matthew Figueroa <mfigueroa@coconino.az.gov>; William Ring <wring@coconino.az.gov>
**Sent:** Tuesday, September 19, 2017, 5:23:11 PM MST
**Subject:** ICE DETAINER REQUESTS

   Hi Matt and Bill,  This late afternoon I received a call from the jail about an inmate request to see me re civil rights issues.  Robin at the front desk called me and I also spoke to Sgt. Packard.  I also spoke to his attorney (Cabell Breckinridge - immigration attorney) who was waiting in the jail lobby.  I understand from Breckinridge, and essentially confirmed by Sgt. Packard, there is no court order hold on Nava Sanchez (local, state or federal) and the jail was just holding him pursuant to an ICE "warrant" which is really just a request and as far as I know not signed by a judge.
   I hope you guys can look into this a bit more as there may be some significant liabilities to the County and the Jail District to holding a person without a court order, even for a matter of hours after they otherwise would have been released.  My understanding of the law (and it is evolving) is that any order holding an inmate must come from a judge.  ICE is not a judicial body.  You may want to check and see who signed the ICE "warrant" and see if they are in fact a judge.
   I'm aware that there recently have been significant monetary awards to persons held in custody without a judicial order when held merely on ICE "warrants."  Check with the Maricopa County Jail - I think one was from there.)  I'm not aware of any 48 hour exception as some jurisdictions seem to think is authorized.  As always the law can be a grey area.  Just want you guys to be aware of this.
   Sincerely,  Mik Jordahl, Inmate Civil Rights Advising Atty.

**Mikkel Jordahl** <mikkeljordahl@yahoo.com>                              Tue, Sep 19, 2017 at 7:24 PM
To: Cabell Breckinridge <cabellbkft@gmail.com>, Billy Peard <bpeard@acluaz.org>

Sent from my iPhone

Begin forwarded message:

> **From:** "Ring, William" <wring@coconino.az.gov>
> **Date:** September 19, 2017 at 5:34:48 PM MST

**To:** Mikkel Jordahl <mikkeljordahl@yahoo.com>, "Figueroa, Matthew" <mfigueroa@coconino.az.gov>
**Cc:** "Nicoletti-Jones, Jane" <jnicoletti-jones@coconino.az.gov>, "Winkeler, Rose"
<rwinkeler@coconino.az.gov>
**Subject: RE: ICE DETAINER REQUESTS**

Mik,

Thank you for the note. If you will, the Code of Federal Regulations are instructive in this area. The CFR's *may* provide that the Director or his/her designee is authorized to sign and issue warrants, but it would be necessary for one of our civil lawyers to confirm the facts and the law in this particular case. We will discuss the matter with our client and provide an update to you shortly.

Thank you Mik.

Regards, b.ring



William P. Ring

County Attorney

COCONINO COUNTY ATTORNEY'S OFFICE

110 East Cherry Avenue

Flagstaff, Arizona 86001

Direct (928) 679-8212

Office (928) 679-8200

Fax (928) 214-6115

**Confidentiality Notice**

This electronic communication is confidential and is intended only for the stated recipients. The communication may be subject to the attorney-client privilege. Attachments to the email, if any, may be subject to attorney-client privilege and/or attorney-work product privilege. No waiver of any applicable privilege(s) should be inferred by the inadvertent receipt of this message by an unintended party. Pursuant to Ariz. R. Civ. P. 26(b)(6)(B) and E.R. 4.4(b), you are notified that any disclosure, copying, or other use of this document by an unintended recipient is strictly prohibited. Efforts to discover or use metadata found within this email is also prohibited in most circumstances. *See* State Bar of Arizona Ethics Op., 07-03. Please contact the sender at wring@coconino.az.gov to report unintended receipt.

**From:** Mikkel Jordahl [mailto:mikkeljordahl@yahoo.com]
**Sent:** Tuesday, September 19, 2017 5:23 PM
**To:** Figueroa, Matthew <mfigueroa@coconino.az.gov>; Ring, William
<wring@coconino.az.gov>
**Subject:** ICE DETAINER REQUESTS


    Hi Matt and Bill, This late afternoon I received a call from the jail about an inmate request to see me re civil rights issues. Robin at the front desk called me and I also spoke to Sgt. Packard. I also spoke to his attorney (Cabell Breckinridge - immigration attorney) who was waiting in the jail lobby. I understand from Breckinridge, and essentially confirmed by Sgt. Packard, there is no court order hold on Nava Sanchez (local, state or federal) and the jail was just holding him pursuant to an ICE "warrant" which is really just a request and as far as I know not signed by a judge.

    I hope you guys can look into this a bit more as there may be some significant liabilities to the County and the Jail District to holding a person without a court order, even for a matter of hours after they otherwise would have been released. My understanding of the law (and it is evolving) is that any order holding an inmate must come from a judge. ICE is not a judicial body. You may want to check and see who signed the ICE "warrant" and see if they are in fact a judge.

    I'm aware that there recently have been significant monetary awards to persons held in custody without a judicial order when held merely on ICE "warrants." Check with the Maricopa County Jail - I think one was from there.) I'm not aware of any 48 hour exception as some jurisdictions seem to think is authorized. As always the law can be a grey area. Just want you guys to be aware of this.

    Sincerely, Mik Jordahl, Inmate Civil Rights Advising Atty.

---

**Mikkel Jordahl** <mikkeljordahl@yahoo.com>          Wed, Sep 20, 2017 at 9:55 AM
To: Billy Peard <bpeard@acluaz.org>, Cabell Breckinridge <cabellbkft@gmail.com>

Hi Billy, Can I get your quick thoughts on the response to my email yesterday bringing up the federal regs? Was hoping I'm not totally off base! Mik

----- Forwarded Message -----
**From:** Mikkel Jordahl <mikkeljordahl@yahoo.com>
[Quoted text hidden]

---

**Billy Peard** <bpeard@acluaz.org>          Wed, Sep 20, 2017 at 10:40 AM
To: Mikkel Jordahl <mikkeljordahl@yahoo.com>, Cabell Breckinridge <cabellbkft@gmail.com>

Yes I think your email to the county attorney was accurate. It is true that the detainers and the so-called "administrative" warrant attached to the detainer request is not issued by a judicial officer. My letter draft touches on this topic and argues that an ICE agent is not a "neutral and detached magistrate" as required by the Supreme Court in Gerstein v. Pugh and progeny. I argue in the letter that an ICE supervising officer is not neutral and detached. Typically, it's a supervisor within ICE that signs the administrative warrant accompanying the detainer request. Unfortunately, there is not clear case law currently on this question of whether ICE is neutral and detached, and in fact there is at least one negative case on this topic within the Ninth Circuit (which I did not cite in my draft letter)

Get Outlook for iOS

---

**From:** Mikkel Jordahl <mikkeljordahl@yahoo.com>

**Sent:** Wednesday, September 20, 2017 9:55:43 AM
**To:** Billy Peard; Cabell Breckinridge
**Subject:** Fw: Fwd: ICE DETAINER REQUESTS

[Quoted text hidden]

**Cabell Breckinridge** <cabellbkft@gmail.com>                          Wed, Sep 20, 2017 at 10:51 AM
To: Billy Peard <bpeard@acluaz.org>

Your letter looks great to me Billy, thanks.  Same with your note Mik.

Maybe we can all check in on next steps at some point.

Billy, is ACLU willing to represent Cecilio in a lawsuit?  Or to have an attorney come talk to him about the possibility?
 (Not sure when he and I will be in touch)

Thanks, Cabell
[Quoted text hidden]

# EXHIBIT "C"

# EXHIBIT "C"

ALESSANDRA SOLER
EXECUTIVE DIRECTOR
DALE BAICH
PRESIDENT



*Via Email and Certified Mail*

September 28, 2017

Sheriff Jim Driscoll
Coconino County Sheriff's Office
911 E. Sawmill Rd.
Flagstaff, AZ 86001
jdriscoll@coconino.az.gov

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA
P.O. BOX 17148
PHOENIX, AZ 85011-0148
P/602.650.1854
F/ 602.650.1376
WWW.ACLUAZ.ORG

**Re:  Coconino County Sheriff's Office July 28, 2017 Revised Detention Policy Relating to Apprehension of Suspected Undocumented Immigrants**

Dear Sheriff Driscoll:

We recently reviewed the July 28, 2017 version of the Coconino County Sheriff's Office's policy related to the apprehension of suspected undocumented immigrants and your agency's protocols for communicating with U.S. Immigration and Customs Enforcement (ICE).  We write to express our deep concerns with various aspects of this policy, as we believe the policy as written opens your agency to unnecessary legal liability and allows for routine (albeit perhaps unintentional) Fourth Amendment violations within the detention facility.  We write in the spirit of collaboration, suggesting steps that your agency can take to reduce legal liability while also complying with all relevant state and federal laws.  We are copying the County Attorney, as we understand that the County Attorney's Office sometimes advises your agency in matters such as this.  We welcome the opportunity to speak further with you about this matter.

## I.    Coconino County Policy Related to 48-Hour ICE Detainers

The July 28, 2017 policy indicates that detention staff are now required to honor federal detainers submitted to your agency by ICE.  Further, the policy requires detention staff to hold an inmate who is named in an ICE detainer for up to 48 hours beyond the time when your agency "has no other legal basis for continuing the detention" (Paragraph 10A of July 28, 2017 policy).

Despite the public rhetoric in recent months emanating from Washington, it remains the case that no federal or state law requires a local law enforcement agency (LEA) to honor ICE detainers. It is also important to note that honoring an ICE detainer– even for less than 48 hours – has been found to be unconstitutional by several courts throughout the country and frequently results in financial liability for the LEA.  As explained below, this is true even if the subject of the ICE detainer is determined beyond doubt to have been in the United States unlawfully.

### A. ICE Detainers are requests to the local law enforcement agency, and no state or federal law requires Coconino County to honor ICE detainers.

An immigration detainer is a request from ICE that an LEA detain an individual in custody on local charges for up to forty-eight hours beyond the time when the individual would otherwise be released, in order for ICE to take the individual into federal custody.[1]  ICE has now taken the official position that its detainers are mere requests.[2]  Campaign rhetoric aside, nothing published by the current Administration indicates otherwise.  Indeed, the Trump Administration has re-affirmed that Form I-247 and I-247A are nothing more than requests.[3]  ICE itself recently added a new section to its website where it acknowledges the large number of local jurisdictions that have opted not to honor ICE detainers and implicitly acknowledges that it is powerless to require compliance.[4]  Moreover, it is now widely accepted that it would be unlawful for the federal government to treat an ICE detainer as a

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

---

[1] 8 C.F.R. § 287.7 (2011).  Immigration detainers may also be referred to as immigration holds or ICE holds. *See, e.g., Sanchez Ochoa v. Campbell*, 2017 WL 3476777, 1 (E.D. Wash. 2017) ("[the county] ha[s] referred to the hold as an 'ICE hold' and an 'immigration hold.'  An immigration hold by any other name is still an immigration hold.").

[2] *Orellana v. Nobles County*, 230 F.Supp.3d 934, 940 (D. Minn. 2017) (citing a 2014 letter from a local county attorney in Minnesota who stated: "Even ICE lawyers have backed down from their previous positions and now have acknowledged to us that these requests are just that, requests and are voluntary.").

[3] *See, e.g., Lunn v. Massachusetts*, 477 Mass. 517, 526 (2017) (noting that the United States, in court filings submitted since President Trump took office, "concedes that compliance by State authorities with immigration detainers is voluntary, not mandatory.");  DHS Form I-247A, issued by President Trump's Acting ICE Director Thomas Homan in March 2017 (indicating that "it is therefore requested that you: . . . maintain custody of the alien for a period not to exceed 48 hours . . .") (emphasis added).

[4] UNITED STATES IMMIGRATION & CUSTOMS ENFORCEMENT,  *FAQ on Sensitive Locations and Courthouse Arrests*, (last updated June 31, 2017), https://www.ice.gov/ero/enforcement/sensitive-loc. (In explaining why it has increased its enforcement activities in state courthouses during recent months, ICE explains the following on its website: "In years past, most individuals arrested at a courthouse would have been turned over to ICE by local authorities upon their release from jail based on ICE detainers . . . [S]ome law enforcement agencies no longer honor ICE detainers . . .").

mandatory command.[5]  In short, ICE detainers are optional requests to LEAs and cannot become mandatory even in the event of a future statutory or regulatory change purporting to make them mandatory.

Similarly, nothing in Arizona state law requires an LEA to honor or otherwise respond to ICE detainers.  Some LEAs have erroneously interpreted state law SB 1070 (codified as A.R.S. § 11-1051 and various portions of Title 13) to require LEAs to respond to ICE detainers.  This is simply not the case.  SB 1070 makes no mention of ICE detainers or an LEA's obligations to comply with them.  Notably, a number of LEAs in Arizona refuse to honor ICE detainers.  For instance, the Maricopa County Sheriff's Office announced in February 2017 that, pursuant to the advice received from the Maricopa County Attorney's Office, it would no longer honor ICE detainers.[6]  The Coconino County Sheriff's Office should do the same.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

**B. Coconino County does not run the risk of being deemed a "sanctuary jurisdiction" by the federal government and does not risk federal funding or federal grants if it were to adopt a new policy refusing to honor ICE detainers.**

Under the current political climate, many LEAs have grown concerned about being classified a "sanctuary" jurisdiction by the Trump Administration.  Some LEAs fear that such designation may result in a loss of federal funds or ineligibility for future federal grants.  Despite President Trump's public remarks on the matter, the Government has recently clarified that its designation of "sanctuary jurisdictions" is completely distinct from an LEA's compliance or lack of compliance with ICE detainers.  On May 22, 2017, Attorney General Jeff Sessions issued a memorandum clarifying that the "sanctuary" designation applies only to those jurisdictions that "willfully refuse to comply with 8 U.S.C. § 1373."  The memorandum goes on to acknowledge that the Administration's "definition of 'sanctuary jurisdiction' is narrow."  Federal courts have confirmed that Attorney General Sessions's definition of "sanctuary" is the only such definition found anywhere within our laws.[7]

---

[5] *Miranda-Olivares v. Clackamas County*, 2014 WL 1414305, 6 (D. Or. 2014) ("[T]he Tenth Amendment requires that 8 CFR 297.7 be deemed a request."); *Galarza v. Szalczyk*, 245 F.3d 625, 634 (3rd Cir. 2014) ("[I]mmigration detainers do not and cannot compel a state or local law enforcement agency to detain suspected aliens subject to removal."); *Lunn v. Massachusetts*, 477 Mass. 517, 526 (2017) ([T]he Government's concession [that ICE detainers are merely voluntary] is well founded . . . the Tenth Amendment to the United States Constitution prohibits the Federal government from compelling states to employ their resources to administer and enforce Federal programs.").

[6] Megan Cassidy, *Maricopa County Sheriff's Office: No more 'courtesy holds' for federal immigration* agents, AZ CENTRAL, (Feb. 21, 2017 6:53 PM), http://www.azcentral.com/story/news/local/phoenix/2017/02/17/maricopa-county-sheriffs-office-courtesy-holds-federal-immigration-agents-ice/98072980/.

[7] *County of Santa Clara v. Trump*, 2017 WL 1459081 (N.D. Cal. 2017) ("[T]here are no laws, besides the Order, outlining what a sanctuary jurisdiction is . . ."); Memorandum of New York State Attorney General Eric Schneiderman, Jan. 19,

3

The one and only federal statute referenced in the Attorney General's definition of "sanctuary" is 8 U.S.C. § 1373, a 1996 law that addresses only the "flow", "exchange", or "communication" of immigration-related information between local agencies and the federal government.[8]  Every court to have considered the meaning of 8 U.S.C. § 1373 has concluded that the law addresses only an LEA's sharing of information about immigration status and not its decisions related to detention of inmates.[9]  As one federal court recently summarized the distinction, "[e]xchanging information and cooperating is one thing.  What happened here was quite another – it was detention."[10]  Indeed, the Trump Administration appears to agree with this assessment.  The federal agency responsible for administering federal grants to LEAs recently clarified that 8 U.S.C. § 1373 addresses only local policies that "prohibit the sending or receiving of information about an individual's citizenship or immigration status".[11]  In short, Coconino County faces no risk of being designated a "sanctuary" jurisdiction if it were to refuse to honor ICE detainers.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

## C. Under its current policy, Coconino County has opened itself up to potentially significant legal liability.

Not only are LEAs not required to honor ICE detainers, but they also open themselves to significant legal liability by doing so.  During the past four years, federal courts throughout the country have confirmed that holding an inmate without probable cause at the request of ICE for any period of time beyond when he or she would otherwise be released is a violation of the Fourth

---

2017 ('Sanctuary' is not a legal term and does not have any fixed or uniform legal definition").

[8] *Sturgeon v. Bratton*, 174 Cal. App. 4th 1407, 1423 (2009) ("It cannot seriously be disputed that Congress's objective in enacting section 1373 was to eliminate any restrictions on the voluntary flow of immigration information between state and local officials and ICE; indeed, the express language of section 1373 does just that."); *Bologna v. City & Cty. of San Francisco*, 192 Cal. App. 4th 429, 439 (2011) (finding that 8 U.S.C. § 1373 was not intended "to protect the public from violent crimes committed by illegal immigrants" but rather to "eliminat[e] restrictions on the voluntary flow of immigration information between state and local entities and federal immigration officials.").

[9]*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (finding that the provisions in 8 U.S.C. § 1373 "do not directly compel states or localities to require or prohibit anything. Rather, they prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with the INS [now known as ICE]."); *City of Chicago v. Sessions*, 2017 WL 4081821, 11 (N.D. Ill. 2017) ("Section 1373 does not require the 'forced participation' of state officers to 'administer or enforce a federal regulatory program.' It merely precludes a state or local government from 'prohibit[ing], or in any way restrict[ing], any ... official' from sending, requesting, maintaining, or exchanging 'information . . . '").

[10] *Sanchez Ochoa v. Campbell*, 2017 WL 3476777 (E.D. Wash.  2017).

[11] BUREAU OF JUST. ASSISTANCE, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373*, https://www.bja.gov/funding/8uscsection1373.pdf.

4

Amendment.[12]  Courts have repeatedly held that prolonging the detention of an individual for longer than the original purpose of arrest triggers the Fourth Amendment again and requires a fresh and independent finding of probable cause for the continued period of detention.[13]  Therefore, the continued detention of an individual beyond the time he or she would otherwise be released – even if for less than 48 hours – requires either a warrant or a new finding of probable cause that a crime was committed.

As explained more fully below, the administrative warrants that currently accompany ICE's Form I-247A are not valid judicial warrants upon which a local jurisdiction may rely. And a local jurisdiction is constitutionally incapable of making an independent probable cause determination based upon an ICE detainer.  This is true even where the local official relies upon ICE's Form I-247A, which states that "DHS has determined that probable cause exists that the subject is a removable alien." This is because a local jurisdiction is empowered to restrain a person's liberty only where there is suspicion of a <u>criminal</u> violation.[14]  Being a "removable alien" is a civil matter and not a criminal one.[15]  Courts have repeatedly found that no amount of evidence of

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

---

[12] *Santoyo v. United States*, 2017 WL 2896021, 7 (W.D. Tex. 2017) (granting summary judgment against county and holding that county's detention pursuant to an ICE detainer for any length of time "is a Fourth Amendment seizure that must be supported by probable cause or a warrant."); *Morales v. Chadbourne*, 793 F.3d 208, 212 (1st Cir. 2015) (holding that an ICE detainer resulting in 24 hours of additional detention in the state facility "violated a clearly established Fourth Amendment right."); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305, 11 (D. Or. 2014) (granting summary judgment against county and holding that county's policy honoring ICE detainers "violated Miranda-Olivares' Fourth Amendment rights by detaining her without probable cause [for 19 hours] after her release from state charges."); *Mercado v. Dallas Cnty., Texas*, 229 F. Supp. 3d 501, 513 (N.D. Tex. 2017) (denying county's motion to dismiss and finding that detained individuals "plausibly alleged [a Fourth Amendment violation] . . . that Dallas County detained them after they were otherwise eligible for release, without probable cause to believe they had committed or were committing a criminal offense.").

[13] *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305, 9 (D. Or. 2014) ("The seizures that allegedly violated her Fourth Amendment rights were not a continuation of her initial arrest, but new seizures independent of the initial finding of probable cause for violating state law."); *Santoyo v. United States*, 2017 WL 2896021, 7 (W.D. Tex. 2017). ("[D]etention pursuant to an ICE detainer request is a Fourth Amendment seizure that must be supported by probable cause or a warrant."); *Ochoa v. Campbell*, 2017 WL 3476777, 7 (E.D. Wash. 2017) ("Where detention is extended as a result of an immigration hold, that extension is a subsequent seizure for Fourth Amendment purposes.")

[14] *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 892 (D. Ariz. 2013), *aff'd*, 784 F.3d 1254 (9th Cir. 2015) ("As a local law enforcement agency without 287(g) authority, the MCSO has no statutory, inherent, or constitutional authority to detain people for civil violations of federal immigration law.").

[15] *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013)("Because civil immigration violations do not constitute crimes, suspicion or knowledge that an individual has committed a civil immigration violation, by itself,

5

unlawful status justifies continued detention by an LEA.[16]  Additionally, courts have found that ICE's Form I-247 provides local authorities with absolutely no probable cause to believe a crime has been committed, even when ICE checks one of the pre-printed boxes indicating its basis for probable cause.[17]

Some LEAs have found justification for extended detention in the federal regulations and ICE agency policies related to detainers.  Such reliance is misplaced.  The relevant regulation is found at 8 C.F.R. § 287.7, which itself does not require ICE agents to make a probable cause determination prior to issuing a detainer.[18]  ICE's current written policy related to detainers _does_ require an ICE agent to "establish probable cause to believe that the subject is an alien who is removable,"[19] yet such probable cause is not transferrable to the LEA, for the reasons described above.  A local government must make its own independent finding of probable cause and may not rely on ICE's probable cause determinations.[20]  This point is underscored by the fact that an

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

---

does not give a law enforcement officer probable cause to believe that the individual is engaged in criminal activity."); _Melendres v. Arpaio_, 695 F.3d 990, 1001 (9th Cir. 2012) ("[B]ecause mere unauthorized presence is not a criminal matter, suspicion of unauthorized presence alone does not give rise to an inference that criminal activity is 'afoot.'" (internal citation omitted)); _Arizona v. United States_, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

[16] _Santos v. Frederick Cnty. Bd. of Comm'rs_, 725 F.3d 451, 465 (4th Cir. 2013) (holding that state and local law enforcement officials "may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law.");  _Mercado v. Dallas Cty., Texas_, 229 F. Supp. 3d 501, 512 (N.D. Tex. 2017) (holding that the detention of an individual based "solely on . . . [the county's] belief that plaintiffs had committed a civil immigration offense and without probable cause to believe they had committed a criminal offense" raises a valid Fourth Amendment claim.); _Artiga Carrero v. Farrelly_, 2017 WL 4167398, 9 (D. Md. 2017) (finding that where local police stopped an individual based solely on suspicion of unlawful immigration status, the local officer "lacked probable cause (or even reasonable suspicion) to justify the stop at its inception, and therefore . . . [the immigrant] plausibly alleged an unreasonable seizure under the Fourth Amendment.").

[17] _Santoyo, supra_ note 12

[18] § 287.7, _supra_ note 1 (mentioning only that an ICE detainer "serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency", without indicating whether the Department seeking custody has made any probable cause or reasonable suspicion determination.).

[19] UNITED STATES IMMIGRATION & CUSTOMS ENFORCEMENT,  Policy No. 10074.2 (Apr. 2, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

[20] _Santoyo_ at 6, _supra_ note 12 ("Defendant suggests that County officials were entitled to rely upon ICE's probable cause determination.  The court does not agree."); _Miranda-Olivares v. Clackamas Cnty._, 2014 WL 1414305, 11 (D. Or. 2014) ("Therefore, it was not reasonable for the jail to believe it had probable cause to detain Miranda-Olivares based on the box checked on the ICE detainer."); _Garcia v. Speldrich_, 2014 WL 3864493, 12 (D. Minn. 2014) ("The decision to hold the

6

LEA is not shielded from liability even when the detained individual is later determined beyond doubt to have been in the country unlawfully.[21]

On the basis of the clearly established Fourth Amendment concerns described above, several former inmates have now obtained significant monetary awards from the counties that erroneously detained them pursuant to ICE detainers.  Below is a sample of the various settlements and court-ordered awards against local jurisdictions in recent years:

1. *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305 (D. Or. 2014) (court ordered the county to pay $30,100 in damages and $97,000 in attorneys' fees following the erroneous detention of inmate for two weeks pursuant to an ICE detainer).

2. *Davila v. N. Regional Joint Police Bd.*, 979 F. Supp. 2d 612 (W.D. Pa. 2013) (a Pennsylvania county settled case for $25,000 in damages, following the erroneous detention of an inmate for one night beyond when he otherwise would have been released.).

3. *Valdez-Sandoval v. Walcher* (accessed at: http://themeyerlawoffice.com/aclu-mlo-reach-settlement-with-arapahoe-county/) (Arapahoe County, Colorado settled a case for $30,000 before the lawsuit was filed in court, following a three-day detention beyond the time when the inmate otherwise would have been released).

4. *Goodman v. Arpaio*, 2:16-cv-04388 (D. Ariz. 2017) (Maricopa County settled the case earlier this year for $30,750 in damages plus attorneys' fees, following the erroneous detention of an inmate for 24 hours after she otherwise would have been released).

5. *Galarza v. Szalczyk*, 745 F.3d 634 (3rd Cir. 2014) (Lehigh County, Pennsylvania, settled the case for $95,000 in damages plus attorneys' fees, following the erroneous detention of inmate for 2.5 days beyond when he otherwise would have been released).

6. *Uroza v. Salt Lake Cnty.*, 2013 WL 653968 (D. Utah 2013) (Utah county settled for $75,000 in damages and an additional amount in attorneys' fees after the county continued holding the inmate on an ICE detainer after posting bail on the local charges).

7. *Del Agua v. Jones*, 2:15-cv-00185, Doc. 6 (E.D. Cal. 2015) (Sacramento County settled for $25,000 in March 2015 following the erroneous detention of inmate for three days after she otherwise would have been released).

[suspected undocumented immigrants] in response to the detainers rested entirely with . . . the Mille Lacs County officers. Thus it was those local law enforcement officers that seized the Group . . . not [the ICE agent].").

[21] *Orellana v. Nobles Cnty.*, 230 F.Supp.3d 934, 934 (2017) (finding a Fourth Amendment violation after county held inmate pursuant to an ICE detainer who had readily admitted to authorities his unlawful immigration status).

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA

7

**D. ICE Form I-247A and the accompanying forms provided by ICE are not valid warrants and reliance upon them in no way immunizes Coconino County from potential legal liability.**

Just as local jurisdictions may not rely on ICE's determination of probable cause, so too a local jurisdiction may not rely on ICE's proffered "warrant." On March 24, 2017, ICE issued a new Form I-247A, designed to supersede previous versions of the ICE detainer form. Along with the new Form I-247A, ICE issued a directive requiring the detainer form to always be accompanied by one of two forms establishing that an ICE officer has made a determination that there is "probable cause to believe that the subject is an alien who is removable from the United States . . ." (Form I-200 and Form I-205). These two forms are styled as "warrants."[22] Despite its statements to the contrary, however, ICE's new approach to detainers does not cure the constitutional deficiencies because neither Form I-200 nor Form I-205 is a warrant meeting the strictures of the Fourth Amendment.[23]

The Supreme Court has long required that warrants be issued by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."[24] While the Fourth Amendment does not require that the neutral and detached magistrate be a judge, he or she must nevertheless "manifest that neutrality and detachment demanded of a judicial officer" and cannot be someone who merely acts as "an adjunct law enforcement officer."[25] Both Form I-200 and Form I-205 are signed by an "authorized ICE immigration officer."[26] Often, this is a supervising ICE agent who is employed within the same ICE office as the agent initiating the investigation. In other words, the person authorizing the "warrant" can hardly be considered a neutral and detached magistrate who is not merely an "adjunct law enforcement officer."[27] And again, even if Form I-200 and Form I-205 were signed by a judicial officer, such a warrant would not provide the type of probable cause needed for an LEA, which is empowered to arrest individuals for suspected <u>criminal</u> activity but not for <u>civil</u> immigration offenses.

**II.      Coconino County policy related to ICE notification**

In addition to the County's policy related to ICE detainers, we also write to express concerns about the County's practice of notifying ICE in advance of

---

[22] Form I-200 is styled "Warrant for Arrest of Alien" and Form I-205 is styled "Warrant of Removal/Deportation".

[23] Policy No. 10074.2, *supra* note 19.

[24] *Johnson v. United States*, 333 U.S. 10, 13–14 (1948).

[25] *United States v. Leon*, 468 U.S. 897, 914 (1984).

[26] Policy No. 10074.2, *supra* note 19.

[27] *Ochoa* at 7, *supra* note 10 (E.D. Wash. 2017) (finding that an ICE "Supervisory Detention and Deportation Officer" who signed Form I-200 is not a neutral magistrate for purposes of the Fourth Amendment).

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

releasing an inmate.  In the July 28, 2017 policy referenced above, detention staff are directed to notify ICE "immediately upon reasonable suspicion, notification, or admission that an inmate in our facility is an alien and is unlawfully present in the United States."  We recognize that even when an LEA chooses not to honor ICE detainers, it may nevertheless choose to notify ICE in advance of releasing the inmate.  Again, we write to clarify that no state or federal law requires an LEA to do this.  To the contrary, such a practice may undermine an LEA's primary mission of detecting and investigating local crime and may also open the LEA to potential legal liability.

Upon obtaining reasonable suspicion that an inmate is unlawfully present, a local law enforcement officer has no obligation under SB 1070[28] or 8 U.S.C. § 1373 to communicate such knowledge to ICE or any other federal agency.  As described above, 8 U.S.C. § 1373 addresses the extent to which an LEA can limit or restrict communication of immigration status to ICE.  It is undisputed that the law "prohibits prohibitions on local officials' voluntary participation."[29]  In other words, the law prohibits an LEA from issuing a policy that prohibits employees from communicating with <u>ICE about the citizenship or immigration status</u> of an individual.  Section 1373, however, does not address the communication with ICE about other matters unrelated to immigration status.  For example, an LEA could adopt a policy limiting the ability of its employees to notify ICE of the <u>release date or release time of an inmate</u>.[30]

Similarly, Section 1373 does not obligate every law enforcement officer in the nation to notify ICE every time that it has in its custody a suspected undocumented individual.  Section 1373 merely says that the local officer's employer (ie, the LEA) cannot forbid him from communicating with ICE if he so chooses.[31]  In fact, Section 1373 does not even require LEAs to "assist" in

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

---

[28] While the discussion above focuses on 8 U.S.C. § 1373, the same analysis applies to SB 1070, which uses almost identical language in Section F.  *Compare* SB 1070 (codified at A.R.S. § 11-1051(F)) *with* 8 U.S.C. § 1373(a).  SB 1070 prevents localities from prohibiting the "sending, receiving, or maintaining [of] information relating to the immigration status, lawful or unlawful, or any individual or exchanging that information with any other federal, state or local government entity."  8 U.S.C. § 1373 prevents a locality from prohibiting the "sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

[29] *City of Chicago v. Sessions*, 2017 WL 4081821, at *11 (N.D. Ill. 2017).

[30] *Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017) (concluding that "[n]othing in 8 U.S.C. § 1373(a) addresses information concerning an inmate's release date. The statute, by its terms, governs only 'information regarding the citizenship or immigration status. . .'") (internal citations omitted)

[31] *Sessions*, supra note 29 ("Section 1373 does not require the 'forced participation' of state officers to 'administer or enforce a federal regulatory program.' It merely precludes a state or local government from 'prohibit[ing],' or in any way restrict[ing], any . . . official' from sending, requesting, maintaining, or exchanging information . . ."): *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (finding that

ICE's enforcement programs, so long as the LEA does not discipline or punish those officers who choose to communicate with ICE regarding the immigration status of inmates.[32]  In short, a local policy clarifying that jail staff are not <u>required</u> to communicate with ICE would be lawful and would not place Coconino County at risk of losing federal funds.[33]  Furthermore, a policy prohibiting jail staff from communicating with ICE about release times would also be permissible.

A policy that that gives each jail employee the personal option of whether to notify ICE in each given circumstance would strengthen the agency's objective of detecting and investigating local crimes and would also further reduce the risk of legal liability.  Reports from throughout the country during 2017 confirm that Latino residents are reporting violent crimes and property crimes at far lower rates compared to previous years. In Houston, for example, Police Chief Art Acevedo recently noted a 43 percent reduction in Latinos reporting sexual assault during the first three months of 2017 compared to the same period in 2016.  He commented that "[w]hat we've created is a chilling effect . . . [because Latinos are] afraid that we're more interested as a society in deporting them than we are in bringing justice to the victims of crime."[34]  Similar trends are emerging in other cities.[35]  LEAs throughout the country have modified their policies related to immigration enforcement in an effort to build trust among immigrant communities and encourage the reporting of local crimes.

Finally, there is some indication that LEAs may face legal liability when they notify ICE of their "reasonable suspicion" of an inmate's unlawful status.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

---

Section 1373 "prohibit[s] state and local governmental entities or officials only from <u>directly restricting</u> the voluntary exchange of immigration information with the INS.") (emphasis added).

[32] *Id.*

[33] *Sessions, supra* note 29 (prohibiting the Justice Department from requiring LEAs to "provide federal agents advance notice of the scheduled release [of undocumented immigrant inmates]" as a pre-condition to receive federal law enforcement grants).

[34] John Burnett, *New Immigration Crackdowns Creating 'Chilling Effect' On Crime Reporting*, NPR, (May 25, 2017, 4:54 AM), http://www.npr.org/2017/05/25/529513771/new-immigration-crackdowns-creating-chilling-effect-on-crime-reporting.

[35] James Queally, *Latinos are reporting fewer sexual assaults amid a climate of fear in immigrant communities, LAPD says*, L.A. TIMES, (Mar. 21, 2017, 8:25 PM), http://www.latimes.com/local/lanow/la-me-ln-immigrant-crime-reporting-drops-20170321-story.html ("[Police Chief] Beck said reports of sexual assault have dropped 25% among the city's Latino population since the beginning of 2017 compared with the same period last year, adding that reports of domestic violence have fallen by 10%. Similar decreases were not seen in reports of those crimes by other ethnic groups, Beck said."); Matthew Feeney, *Since Trump, Latinos Are Reluctant to Report Crime*, NEWSWEEK, (May 26, 2017, 10:26 AM), http://www.newsweek.com/trump-latinos-are-reluctant-report-crime-616253 (reporting on similar trends cited by the Denver Police Department and Philadelphia Police Department during 2017.)

10

To be clear, this class of liability is separate and distinct from the liability discussed above related to the honoring of ICE detainers. In recent years, for example, LEAs have been sued for negligence and constitutional violations when a local officer notifies ICE on the basis of reasonable suspicion of unlawful status and such notification proves to be based on an inadequate investigation of the facts.[36] A modification of the current July 28, 2017 jail policy should clarify that jail staff are not required to notify ICE in all circumstances where reasonable suspicion may exist, and that jail staff not be permitted to communicate with ICE about anticipated release times. Such an approach would eliminate possible legal liability and ensure compliance with federal and state laws.

## CONCLUSION

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

We urge the Coconino County Sheriff's Office to reconsider its July 28, 2017 detention facility policy and to take the following steps related to inmates for whom there may be reasonable suspicion of unlawful immigration status:

1. End the practice of honoring ICE detainers;

2. Modify the July 28, 2017 policy to clarify that jail staff shall not take steps to prolong the detention of inmates in response to receipt of Forms I-247A, I-200, and I-205 issued by ICE;

3. Modify the July 28, 2017 policy to clarify that, as to all pre-trial detainees, jail staff shall immediately release all detainees when the requisite bail amount is posted on their behalf, regardless of the detainee's suspected immigration status and regardless of the existence of an ICE detainer;

4. Modify the July 28, 2017 policy to clarify that, as to all inmates serving time as the result of a conviction, jail staff shall immediately release inmates upon completion of their sentence, regardless of the existence of an ICE detainer;

---

[36] *Mendoza v. Osterberg*, 2016 WL 6238605, 16 (D. Neb. 2016), *aff'd sub nom, Mendoza v. United States Immigration & Customs Enf't*, 849 F.3d 408 (8th Cir. 2017) ("observing that "[l]aw enforcement officers . . . should be aware that they could face constitutional consequences if negligent data entry errors rise to the level of reckless or intentional disregard or deliberate indifference to constitutional rights."); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 38 (D.R.I. 2014) *aff'd in part, dismissed in part*, 793 F.3d 208 (1st Cir. 2015) ("This Court concludes that Ms. Morales has set forth plausible federal constitutional and state law claims [for negligence] against [Rhode Island State Police] to allow her to proceed . . . in the litigation.")

5.  Modify the July 28, 2017 policy to clarify that jail staff are <u>not required</u> to communicate with ICE regarding the immigration status of a pre-trial detainee who has not yet been convicted of a crime and to clarify that the decision to communicate with ICE in such circumstances lies entirely with the individual employee;

6.  Modify the July 28, 2017 policy to clarify that jail staff are discouraged or even prohibited from notifying ICE of the anticipated release time of a pre-trial detainee or an inmate, even where there is an ICE detainer for that individual.

I look forward to discussing this matter with you further and working together to ensure that Coconino County's jail policies are compliant with all relevant federal and state laws while also advancing your agency's mission of "earn[ing] and maintain[ing] the public's trust and confidence" and "dedicating our resources and skills to these efforts." After considering the above suggestions, we ask that you contact us to discuss the County's planned course of action no later than October 24, 2017.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
OF ARIZONA

Sincerely,

Billy Peard
Staff Attorney, ACLU of Arizona

Cc:   Bill Ring
      Coconino County Attorney
      wring@coconino.az.gov

      Jane Nicoletti-Jones
      Deputy Chief
      Coconino County Attorney
      jnicoletti-jones@coconino.az.gov

      Matt Figueroa
      Commander of Detention Services,
      Coconino County Sheriff's Office
      mfigueroa@coconino.az.gov

12

# EXHIBIT "D"

# EXHIBIT "D"

```
** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **
TIME RECEIVED                      REMOTE CSID      DURATION   PAGES   STATUS
December 12, 2017 at 2:37:06 AM MST   6023794502      83         2       Received
```

DEC-12-2017 TUE 02:35     ICE PHOENIX                    FAX:6023794502          P. 001

DEPARTMENT OF HOMELAND SECURITY
## IMMIGRATION DETAINER - NOTICE OF ACTION

| Subject ID: 360081917 | File No: |
| Event #: FED1812000397 | Date: December 12, 2017 |

TO: (Name and Title of Institution - OR Any Subsequent Law
    Enforcement Agency) COCONINO CO DETENTION FAC
    951 E Sawmill Road
    FLAGSTAFF, AZ 86001

FROM: (Department of Homeland Security Office Address)
    PHOENIX, AZ, DOCKET CONTROL OFFICE
    ERO Phoenix Field Office
    2035 N CENTRAL AVE
    PHOENIX, AZ 85004

Name of Alien: TENORIO-SERRANO, GUILLERMO

Date of Birth: 04/09/1986    Citizenship: MEXICO    Sex: M

**1. DHS HAS DETERMINED THAT PROBABLE CAUSE EXISTS THAT THE SUBJECT IS A REMOVABLE ALIEN. THIS DETERMINATION IS BASED ON (complete box 1 or 2).**

- [ ] A final order of removal against the alien;
- [ ] The pendency of ongoing removal proceedings against the alien;
- [ ] Biometric confirmation of the alien's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or
- [x] Statements made by the alien to an immigration officer and/or other reliable evidence that affirmatively indicate the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**2. DHS TRANSFERRED THE ALIEN TO YOUR CUSTODY FOR A PROCEEDING OR INVESTIGATION (complete box 1 or 2).**

- [ ] Upon completion of the proceeding or investigation for which the alien was transferred to your custody, DHS intends to resume custody of the alien to complete processing and/or make an admissibility determination.

IT IS THEREFORE REQUESTED THAT YOU:

- Notify DHS as early as practicable (at least 48 hours, if possible) before the alien is released from your custody. Please notify DHS by calling [x] U.S. Immigration and Customs Enforcement (ICE) or [ ] U.S. Customs and Border Protection (CBP) at (602) 379-3235 . If you cannot reach an official at the number(s) provided, please contact the Law Enforcement Support Center at: (802) 872-6020.
- Maintain custody of the alien for a period NOT TO EXCEED 48 HOURS beyond the time when he/she would otherwise have been released from your custody to allow DHS to assume custody. The alien must be served with a copy of this form for the detainer to take effect. This detainer arises from DHS authorities and should not impact decisions about the alien's bail, rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters
- Relay this detainer to any other law enforcement agency to which you transfer custody of the alien.
- Notify this office in the event of the alien's death, hospitalization or transfer to another institution.
- [ ] If checked: please cancel the detainer related to this alien previously submitted to you on _____ (date).

C 8897 MAGSTAFF - DEPORTATION OFFICER
_____          _____
(Name and title of Immigration Officer)        (Signature of Immigration Officer) (Sign in ink)

Notice: If the alien may be the victim of a crime or you want the alien to remain in the United States for a law enforcement purpose, notify the ICE Law Enforcement Support Center at (802) 872-6020. You may also call this number if you have any other questions or concerns about this matter.

TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE ALIEN WHO IS THE SUBJECT OF THIS NOTICE:

Please provide the information below, sign, and return to DHS by mailing, emailing or faxing a copy to _____.

Local Booking/Inmate #: 17-10264 Estimated release date/time: Unknown

Date of latest criminal charge/conviction: 12/11/17   Last offense charged/conviction: DUI, DUI per .08, Extreme DUI .15-.2   Extreme DUI 7.20

This form was served upon the alien on 12/12/17 , in the following manner:

- [x] in person   [ ] by inmate mail delivery.   [ ] other (please specify):
Robertson #350                              Robertson #350
_____          _____
(Name and title of Officer)                  (Signature of Officer) (Sign in ink)

DHS Form I-247A (3/17)                                              Page 1 of 3

DEC-12-2017 TUE 02:36    ICE PHOENIX              FAX:6023794502           P. 002

## U.S. DEPARTMENT OF HOMELAND SECURITY    Warrant for Arrest of Alien

File No. _____

Date: __12/12/2017__

To:   Any immigration officer authorized pursuant to sections 236 and 287 of the
Immigration and Nationality Act and part 287 of title 8, Code of Federal
Regulations, to serve warrants of arrest for immigration violations

I have determined that there is probable cause to believe that __TENORIO-SERRANO, GUILLERMO__
is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☐ biometric confirmation of the subject's identity and a records check of federal
databases that affirmatively indicate, by themselves or in addition to other reliable
information, that the subject either lacks immigration status or notwithstanding such status
is removable under U.S. immigration law; and/or

☑ statements made voluntarily by the subject to an immigration officer and/or other
reliable evidence that affirmatively indicate the subject either lacks immigration status or
notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the
Immigration and Nationality Act, the above-named alien.   BARRY P
JANSEN
_____
(Signature of Authorized Immigration Officer)

B 7292 JANSEN - (A) SDDO
_____
(Printed Name and Title of Authorized Immigration Officer)

### Certificate of Service

I hereby certify that the Warrant for Arrest of Alien was served by me at ____Phoenix, Arizona____
(Location)

on __TENORIO-SERRANO, GUILLERMO__ on ____December 12, 2017____ , and the contents of this
(Name of Alien)                      (Date of Service)

notice were read to him or her in the _____ENGLISH_____ language.
(Language)

C 8897 WAGSTAFF
DEPORTATION OFFICER                                          N/A
_____      _____
Name and Signature of Officer            Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

EXHIBIT "E"

EXHIBIT "E"

PETER J. ELIASBERG, SBN 189110
 peliasberg@aclu-sc.org
AHILAN ARULANANTHAM, SBN 237841
PETER BIBRING, SBN 223981
JENNIFER PASQUARELLA, SBN 263241
 jpasquarella@aclu-sc.org
KATHERINE TRAVERSO, SBN 290559
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, California 90017
Phone: (213) 977-9500
Facsimile: (213) 977-5299

BARRETT S. LITT, SBN 45527
 blitt@kmbllaw.com
LINDSAY B. BATTLES, SBN 262862
 lbattles@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
234 Colorado Boulevard, Suite. 230
Pasadena, California 91101
Telephone: (626) 844-7600 x112
Fax: (626) 844-7670

Attorneys for Plaintiffs
(continued on next page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN ROY; *et al.*,<br>Plaintiffs,<br><br> vs.<br>COUNTY OF LOS ANGELES; *et al.*,<br><br>Defendants.<br>_____<br><br>GERARDO GONZALEZ, *et al.*,<br> Plaintiffs,<br><br> vs.<br>IMMIGRATION AND CUSTOMS ENFORCEMENT, an entity; *et al.*,<br>Defendants. | Case No. CV 12-09012 BRO (FFMx)<br>Consolidated with:<br>Case No. CV 13-04416 BRO (FFMx)<br><br>[Honorable Beverly Reid O'Connell]<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT<br><br>Date: August 28, 2017<br>Time: 1:30 p.m.<br>Courtroom: 7C |

CHRIS NEWMAN, SBN 255616
 newman@ndlon.org
JESSICA KARP BANSAL, SBN 277347
 jbansal@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
675 South Park View Street, Suite B
Los Angeles, California 90057
Telephone: (213) 380-2214
Facsimile: (213) 380-2787

OMAR C. JADWAT (pro hac vice)
ojadwat@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th floor
New York, NY 10004
Telephone: (212) 549-2660

CECILLIA D. WANG, SBN 187782
cwang@aclu.org
CODY H. WOFSY, SBN 294179
cwofsy@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111

MARK M. FLEMING (pro hac vice)
mfleming@heartlandalliance.org
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

1
2
3                           **TABLE OF CONTENTS**
4
5   I.     Introduction .................................................................................... 1
6   II.    Summary of Facts............................................................................ 2
7     A.   UNTIL MARCH 2014, THE LASD'S PRACTICE WAS TO DETAIN ICE-
8        DETAINER INMATES FOR 48 HOURS, EXCLUDING WEEKENDS AND
9        HOLIDAYS, RESULTING IN THOUSANDS OF DETENTIONS BEYOND 48 HOURS. 2
10    B.   UNDISPUTED EVIDENCE SHOWS THAT LASD ASSIGNED A NO-BAIL
11       NOTATION TO INMATES WITH ICE HOLDS, EFFECTIVELY DEPRIVING THEM
12       OF THE RIGHT TO POST BAIL ........................................................... 3
13    C.   THOUGH IMMATERIAL TO LIABILITY ISSUES IN *ROY*, ICE ROUTINELY ISSUES
14       DETAINERS UNSUPPORTED BY PROBABLE CAUSE.......................... 6
15
16    D.   CALCULATION OF RELEASE DATES ................................................ 8
17  III.   Argument........................................................................................ 8
18    A.   THE LASD DETAINED CLASS MEMBERS WITHOUT AUTHORITY ................. 9
19
20       1.   8 C.F.R. § 287.7 Does Not Alter This Analysis ...................... 12
21       2.   Because California Law Enforcement Have No Arrest Authority for
22           Civil Immigration Violations, ICE's Probable Cause Determinations
23           Cannot Justify An Arrest ...................................................... 15
24       3.   Holding Inmates on Investigative Detainers Violated the Fourth
25           Amendment........................................................................ 17
26    B.   DETENTIONS LONGER THAN 48 HOURS WERE UNLAWFUL............................ 18
27
28       1.   Detentions of Longer Than 48 Hours Violated the Fourth Amendment.. 18

                                 i

1

2.   Detentions of Longer than 48 Hours Violated Due Process.................... 20

D.   DEFENDANTS MISCONSTRUE PLAINTIFFS' CLAIMS REGARDING THE RIGHT
     TO POST BAIL.......................................................................... 21

E.   PLAINTIFFS ASSERT VIABLE CLAIMS UNDER CIVIL CODE § 52.1 ................ 24

F.   DEFENDANTS ASSERT NO FACTS TO ESTABLISH THAT PLAINTIFFS'
     INJUNCTIVE RELIEF CLAIMS ARE MOOT ...................................... 26

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012) ...................................................................12, 14, 15, 17

*Arline v. City of Jacksonville,*
    359 F.Supp.2d 1300 (M.D.Fla. 2005) .........................................................23

*Barnes v. District of Columbia,*
    793 F. Supp. 2d 260 (D.D.C. 2011) ............................................................23

*Brass v. County of Los Angeles,*
    328 F.3d 1192 (9th Cir.2003)......................................................................23

*Campbell v. Johnson,*
    586 F.3d 835 (11th Cir.2009)......................................................................23

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) ....................................................................................21

*County of Los Angeles v. Superior Court,*
    102 Cal. App. 4th 627 (Cal. Ct. App. 2002) ...............................................24

*Cty. of Riverside v. McLaughlin,*
    500 U.S. 44 (1991) ......................................................................................19

*Cty. of Santa Clara v. Trump,*
    No. 17-CV-00485-WHO, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) ...................28

*Dodds v. Richardson,*
    614 F.3d 1185 (10th Cir.2010).....................................................................23

*Doe 1 v. City of Murrieta,*
    102 Cal.App.4th 899 (Cal. Ct. App. 2002) .................................................24

*F.T.C. v. Publ'g Clearing House, Inc.,*
    104 F.3d 1168 (9th Cir. 1997)......................................................................4

iii

1  *Galarza v. Szalczyk,*
2      2012 WL 1080020 (E.D. Pa. Mar. 30, 2012) ........................................9, 23
3  *Galarza v. Szaczyk,*
4      745 F.3d 634 (3rd Cir. 2014).................................................................13, 14
5  *Gerstein v. Pugh,*
6      420 U.S. 103, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) ....................19, 20
7  *Gillian v. City of San Marino,*
8      147 Cal.App.4th 1033 ..............................................................................24
9  Gonzales v. City of Peoria,,
10     722 F.2d 468 (9th Cir. 1983).....................................................10, 13, 15
11 *Hae v. Tenn.*
12     No. CIV. 12-00316 ACK, 2013 WL 4499386 (D. Haw. Aug. 20, 2013)..................23
13 *Johnson v. State,*
14     *of California,* 69 Cal. 2d 782 (Cal. 1968) ................................................24
15 *Julian v. Mission Community Hospital,*
16     11 Cal.App.5th 360 (Cal. Ct. App. 2017) ...............................................26
17 *Ker v. State of Cal.,*
18     374 U.S. 23 (1963) ..........................................................................10, 15
19 *Koog v. United States,*
20     79 F.3d 452 (5th Cir. 1996).........................................................................11
21 *Lopez v. Southern Cal. Rapid Transit Dist.,*
22     40 Cal.3d 780 (Cal. 1985) ..........................................................................24
23 *Lopez-Valenzuela v. Arpaio,*
24     770 F.3d 772 (9th Cir. 2014).......................................................................22
25 *Ma v. City and County of San Francisco,*
26     95 Cal. App. 4th 488 (Cal. Ct. App. 2002) .............................................25
27 *Mathews v. Eldridge,*
28     424 U.S. 319 (1976) ..........................................................................20, 21

1    *Mendia v. Garcia,*
2        2016 WL 2654327 (N.D. Cal. May 10, 2016) ............................................9
3    *Mendoza v. ICE,*
4        849 F.3d 408 (8th Cir. 2017)................................................................16
5    *Mercado v. Dallas County, Texas,*
6        ---F.Supp.3d ---, 2017 WL 169102 (N.D.Tex. Jan. 17, 2017) ...............15, 19
7    *Mercer v. Dep't of Motor Vehicles,*
8        53 Cal. 3d 753, 809 P.2d 404 (1991) ....................................................10
9    *Michigan v. DeFillippo,*
10       443 U.S. 31, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979) ..............................10
11   *Miranda-Olivares v. Clackamas County,*
12       2014 WL 1414305 (D. Or. Apr. 11, 2014).............................9, 17, 23, 27
13   *Moore v. City & Cnty of San Francisco,*
14       5 Cal. App. 3d 728 (Cal. Ct. App.  1970)...............................................22
15   *Morales v. Chadbourne,*
16       793 F.3d 208 (1st Cir. 2015) ..................................................................9
17   *Morales v. Chadbourne,*
18       996 F.Supp.2d 19 (D.R.I. 2014)............................................................17
19   *Moreno v. Napolitano,*
20       213 F.Supp.3d 999(N.D. Ill. 2016) ....................................................9, 14
21   *Ogborn v. City of Lancaster,*
22       *101 Cal. App. 4th 448 (Cal. Ct. App. 2002)* ..........................................25
23   *Orellana v. Nobles Cty.,*
24       No. CV 15-3852 ADM/SER, 2017 WL 72397 (D. Minn. Jan. 6, 2017) ...................14
25   *Oviatt v. Pearce,*
26       954 F.2d 1470 (9th Cir.1992)...............................................................22
27   *People ex rel. Swenson v. Ponte,*
28       994 N.Y.S.2d 841 (N.Y. Sup. Ct. 2014) ................................................15

*Perez v. City of Huntington Park*,
   7 Cal.App.4th 817 (Cal. Ct. App. 1992) ........................................................24

*Powell v. Barrett*,
   376 F.Supp.2d 1340 (N.D.Ga. 2005) ..............................................................23

*Printz v. United States*,
   521 U.S. 898 (1997) ..........................................................................................11

*Rivas v. Martin*,
   781 F. Supp. 2d 775 (N.D. Ind. 2011) .............................................................22

*Roy v. Cty. of Los Angeles*,
   2015 WL 12582637 (C.D. Cal. Nov. 20, 2015) ...............................................25

*Shadwick v. City of Tampa*,
   407 U.S. 345, 92 S. Ct. 2119, 32 L. Ed. 2d 783 (1972) ..................................21

*Shakespeare v. City of Pasadena*,
   40 Cal. Rptr. 863 (Cal. Ct. App. 1964) ...........................................................22

*U.S. v. Davis*,
   174 F.3d 941 (8th Cir. 1999) ............................................................................18

*U.S. v. Ramirez*,
   473 F.3d 1026 (9th Cir. 2007) .....................................................................16, 17

*U.S. v. Sholola*,
   124 F.3d 803 (7th 1997) ....................................................................................18

*Villars v. Kubiatowski*,
   45 F.Supp.3d 791(N.D. Ill. 2014) ....................................................................13

*Willis v. City of Chicago*,
   999 F.2d 284 (7th Cir. 1993) ............................................................................18

*Youngberg v. Romeo*,
   457 U.S. 307 (1982) ..........................................................................................22

vi

## Statutes

8 U.S.C. § 1103(a)(10) ................................................................12

8 U.S.C. § 1252c ........................................................................12

8 U.S.C. § 1324(c) ......................................................................12

8 U.S.C. § 1325 ..........................................................................10

8 U.S.C. § 1357(g)(1) ..................................................................12

8 U.S.C. §1357(d) .......................................................................14

Cal. Const., Art. 1, section 12 ......................................................22

Cal. Pen. Code § 16 ....................................................................11

Cal. Pen. Code § 836(a)(1)-(3) .....................................................11

Cal. Pen. Code §15 .....................................................................11

Cal. Penal Code §§ 1268, 1269b, 1295(a) ......................................22

Civil Code § 52.124 ..........................................................iv, 24, 25, 26

Government Code 820.2 ............................................................24, 25

Govt. Code §815.2 ......................................................................24

Govt. Code §§815.2(a), 820(a) .....................................................24

Pen.Code, § 1295 .......................................................................22

Penal Code § 836(a) ...................................................................11

U.S. Const. amend. V ...................................................................20

§836 .......................................................................................11

## Regulations

8 C.F.R. § 287.12 .......................................................................13

8 C.F.R. § 287.3 .........................................................................18

8 C.F.R. § 287.7 .............................................................iii, 12, 23

8 C.F.R. § 287.7(d) ...............................................................passim

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case arises out of LASD's policy and practice of indiscriminately detaining persons beyond their release dates on the sole basis of immigration detainers issued by ICE, which sought detention for civil immigration violations. The County improperly seeks summary judgment primarily on the basis that detainers are supported by probable cause of removability. This argument reflects a significant mischaracterization of the evidence adduced in this case. As described in the *Gonzalez*-Plaintiffs' Motion for Partial Summary Adjudication against DHS (Dkt. 247-1), ICE routinely issues detainers without probable cause. But, more significantly, for purposes of the instant motion, whether ICE detainers are based on probable cause is immaterial to any class-wide liability issue in this case. Because LASD lacks state law authority to arrest persons for civil immigration violations, incarcerating inmates pursuant to detainers constitutes false imprisonment, irrespective of whether the detainer is supported by probable cause. Even assuming, *arguendo*, that the LASD *was* authorized to arrest persons on immigration detainers, its practice of detaining inmates pursuant to "investigation detainers" (i.e. a detainer form that expressly disclaimed that ICE had probable cause) violated the Fourth Amendment. The LASD's practice of holding inmates for over 48 hours without a probable cause review by anyone—including ICE itself—violated the Fourth and Fourteenth Amendments.

The County's only real response to Plaintiffs' claims is to assert that a federal regulation, 8 C.F.R. § 287.7(d), authorizes it to hold persons on detainers for up to 48 hours excluding weekends and holidays. However, § 287.7(d) does not purport to authorize local law enforcement agencies to detain anyone. Nor could it. As established by controlling precedent, the arrest authority of state officers is a matter of state law; it cannot be unilaterally expanded by a federal regulation. Nor, of

1

1  course, can a regulation authorize detention in violation of the Constitution, which

2  requires a review of probable cause after 48 hours.

3        The County also grossly misconstrues Plaintiffs' bail class liability claims.

4  Plaintiffs do not contend that the LASD personally advised inmates that they were

5  not entitled to post bail, but rather, that the County's use of the no-bail-notation

6  broadly advised LASD employees and the public that ICE-hold inmates were

7  ineligible to post bail, depriving all Bail Class members, including Alain Martinez-

8  Perez, of their right to post bail. Since we do not contend that the LASD personally

9  informed Mr. Martinez-Perez or his family that he was ineligible to post bail, it is

10  unnecessary to address whether any admissible evidence supports that contention.

11  ## II.   SUMMARY OF FACTS

12        The facts that are material to the resolution of Plaintiffs' claims are largely

13  undisputed, and support granting summary judgment for Plaintiffs. *See* Roy

14  Plaintiffs' Mot. for Summary Adjudication Regarding Liability, Doc. 240.

15  ### A.   UNTIL MARCH 2014, THE LASD'S PRACTICE WAS TO DETAIN ICE-

16      DETAINER INMATES FOR 48 HOURS, EXCLUDING WEEKENDS AND

17      HOLIDAYS, RESULTING IN THOUSANDS OF DETENTIONS BEYOND 48

18      HOURS

19        Until March 2014, the LASD blindly complied with every detainer request it

20  received, subjecting more than 13,000 people to extended detention beyond their

21  release date. LASD policy permitted detention of up to 48 hours, excluding

22  weekends and holidays, resulting in thousands of detentions longer than 48 hours.

23  LASD inmate data shows that, between October 2010 and June 2014, approximately

24  7,197 inmates were held for more than 48 hours (at least 3 calendar days) after they

25  became due for release on criminal matters. AMF 17. Every ICE detainer request

26  was expressly for a civil immigration violation.

27        While inmates remained in LASD custody, no review of the probable cause

28  determination (by a second immigration officer, immigration judge or otherwise)

2

occurred within 48 hours. ICE acknowledges that no probable cause review occurs until it takes custody, and often does not occur for up to 48 hours <u>after ICE takes custody,</u> in addition to the time (if any) that the LEA detained the individual based on the detainer. AMF 24, Dkt. 225, DHS Opp. to *Gonzalez*-Plaintiffs' MSJ, p. 4:2-4:18. The LASD never implemented procedures to ensure a review of the probable cause determination within 48 hours, nor did it maintain procedures to ensure that persons held on ICE detainers were released within 48 hours if no probable cause review occurred. AMF 24. Indeed, the LASD had no procedures to track the time inmates held solely on immigration detainers were held before transfer to ICE, even though it has long maintained such procedures to track the length of time a person subject to an out-of-county warrant is held before transfer to the requesting agency to ensure they are not over-detained. AMF 28.

**B.     UNDISPUTED EVIDENCE SHOWS THAT LASD ASSIGNED A NO-BAIL NOTATION TO INMATES WITH ICE HOLDS, EFFECTIVELY DEPRIVING THEM OF THE RIGHT TO POST BAIL**

The LASD not only detained people for days beyond their release date on detainers, but also forced them to remain in custody throughout the duration of their pretrial proceedings, which could last months or years, taking the position that the detainer forbid their release on bail.[1] Defendants have no response to the substantial evidence demonstrating the existence of this practice. Defendants contend, implausibly, that their "policy and practice has always been to allow inmates subject to immigration detainers to post bail." Defendants provide no evidence to support this claim other than a self-serving affidavit, which is insufficient as a matter of law to create a genuine issue of material fact, particularly in light of the abundant

---

[1] It was only when Plaintiffs threatened suit on the LASD's bail practices, laying out why they violated state law and the Fourth Amendment, that LASD agreed to change its bail practices going forward, just days before this lawsuit was filed.

1    evidence Plaintiffs have presented regarding LASD's bail practices. *See F.T.C. v.*
2    *Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr.
3    11, 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any
4    supporting evidence, is insufficient to create a genuine issue of material fact."). Nor
5    can they explain why, if their policy and practice was in fact to permit inmates with
6    immigration detainers to post bail, the data shows that only 0.5% of all releases for
7    inmates with immigration detainers were bail releases during the class period, while
8    8.4% of all releases for inmates with no immigration detainers were bail releases.

9          Regardless, the LASD's liability for detaining members of the Bail Classes
10    does not hinge on whether the LASD directly informed specific individuals that they
11    were ineligible to post bail, but rather, on whether the LASD's use of the no-bail
12    notation precluded inmates with ICE detainers from posting bail or from OR release,
13    in violation of their state and federal constitutional rights. Within LASD's electronic
14    data system, holds, including ICE detainers, are entered as individual charges. AMF
15    29. While some "charges" have specific bail amounts attached to them, others do
16    not have a specific dollar amount attached. AMF 30. Holds that do not have a
17    specific dollar amount attached (each of which are separately entered as a "charge")
18    are entered as a bail amount of $0 and classified as "No Bail" holds. AMF 31.
19    Because immigration detainers are not associated with a specific dollar amount, they
20    were also designated as "No Bail" holds within LASD's electronic data system,
21    despite the fact that an immigration detainer has no legal bearing on the right to post
22    bail (unlike the other types of "No Bail" holds, under which an inmate has no right
23    to bail). AMFs 33, 34. Aside from ICE detainers, the "No Bail" designation is used
24    exclusively for holds for which the inmate **cannot** post bail, including state prison
25    holds (indicating that the person must be returned to the custody of state prison),
26    probation holds (indicating that the person may not be released for probation
27    reasons) and warrants for which there is no bail. AMF 32.
28

4

The "No Bail" notation communicated to LASD employees and to the public that inmates with immigration detainers could not post bail. The "No Bail" designation was communicated to LASD employees via "Inmate Information" sheets (documents containing basic information about inmates including arrest information, booking details and eligibility for bail). AMFs 35-39. All LASD employees with access to its internal network could generate "Inmate Information" sheets (AMFs 36), which have fields for the "Total Hold Bail Amount" and "Grand Total Bail Amount." Both these fields would display as "No Bail" if an inmate had a single "No Bail" hold (including an immigration detainer). AMFs 37-39. As a result, the information sheets associated with any ICE-hold inmate would display the "Grand Total" bail amount as "No Bail" when the inmate was in fact eligible to post bail. AMF 39. LASD's publicly accessible online, inmate locator service, which allows public access to arrest, booking and bail information, similarly used the "No Bail" notation for inmates with immigration detainers. For inmates with immigration detainers, both the "Total Hold Bail Amount" and "Grand Total (bail amount)" displayed as "No Bail," communicating that the inmate was ineligible to post bail. AMFs 40-44.

By characterizing immigration detainers as "No Bail" holds within both internal data systems and to the public, LASD effectively communicated that ICE-hold inmates were ineligible to post bail. LASD acknowledges that characterizing immigration holds as "No Bail" holds created confusion among its employees, and concedes that at least some employees misinterpreted the "No Bail" notation as a bar to posting bail. AMFs 45, 46. Due to this confusion, some LASD personnel advised the public that inmates with ICE detainers were not permitted to post bail. AMF 47. Before October 2012, LASD personnel routinely informed inmates, attorneys, and bail bondsmen that inmates with ICE detainers could not post bail. AMF 50. Before October 2012, it was widely understood among the public and inmates that LASD did not accept bail on behalf of inmates with immigration

5

1 | detainers. AMF 51. In October 2012, LASD issued a written policy advising

2 | personnel that inmates with immigration detainers were permitted to post bail.

3 | AMFs 48.

4 |      LASD's database information shows that the use of the no-bail notation

5 | effectively prohibited inmates with ICE detainers from posting bail. Between

6 | October 19, 2010 and March 20, 2015, of 400,973 releases with no holds, 33,711

7 | inmates were released on bail or bond. Bail/bond releases comprise (8.4 percent) of

8 | releases among inmates with no holds. AMF 53. During the same time period, of

9 | 13,794 jail releases with an ICE detainer, only 71 individuals were released on bail

10 | or bond. Bail/bond releases comprise only 0.5 percent of all releases among inmates

11 | with ICE detainers. AMF 52.

### C. THOUGH IMMATERIAL TO LIABILITY ISSUES IN *ROY*, ICE ROUTINELY ISSUES DETAINERS UNSUPPORTED BY PROBABLE CAUSE

     The County devotes considerable attention to the idea that ICE had probable cause when it issued detainers throughout the entirety of the class period, an issue that is immaterial to class-wide liability in this case. The *Roy* Plaintiffs do not assert class-wide liability on the basis that ICE detainers are unsupported by probable cause. Rather, they assert that the LASD lacked authority under state law to enforce ICE detainers, irrespective of whether the detainers were supported by probable cause. And even if the LASD had authority to enforce detainers, the LASD violated the constitutional rights of persons held on "investigative detainers" (detainers that expressly disclaimed the existence of probable cause), inmates held longer than 48 hours and inmates who would have been eligible to post bail.

     Nevertheless, evidence adduced in this litigation establishes that ICE regularly issued detainers *without* probable cause. Before November 2014, ICE was remarkably indifferent to and uncertain about what quantum of evidence was required to issue an immigration detainer. AMF 101-107. Until December 2012, the detainer form itself did not even purport to be based on probable cause. AMF 2-4.

6

1   ICE's own high-ranking officials had no clear idea what standard was required to

2   issue a detainer, but believed it was *not* probable cause. AMFs 101-107. Moreover,

3   until June 2015, ICE had a policy and practice of issuing detainers against foreign-

4   born individuals based solely on the fact that database searches returned no records.

5   As ICE concedes, evidence of a foreign birth and a "no match" in a federal

6   immigration database does not establish probable cause of alienage and

7   removability. AMFs 177-182.

8          Although ICE has clarified its policies to require probable cause, ICE still

9   relies on database information that is often insufficient to establish probable cause.

10  ICE agents issue detainers solely on the basis of electronic database searches. AMFs

11  122-176. Of the four databases that are searched on a mandatory basis, only two –

12  CIS and CLAIMS – contain immigration status and naturalization information.

13  AMFs 108-110. ICE relies on these databases to supply probable cause of alienage

14  and removability, despite the fact that both databases are notoriously incomplete.

15  AMFs 122-176. ICE acknowledges there are "big gaps" in CIS naturalization

16  information (which is drawn from CLAIMS), especially for records of naturalization

17  before 1990. AMF 127. Neither database permits reliable identification of pre-2010

18  records of enforcement encounters and applications for immigration benefits

19  because such pre-2010 records are not consistently associated with digitized

20  fingerprints. AMFs 128, 129. Neither CIS or CLAIMS identifies individuals born in

21  the US, contains any comprehensive list of foreign-born U.S. citizens who derived

22  citizenship by operation of law upon birth, adoption or the naturalization of a parent,

23  and neither contains indicia of derivative citizenship. AMFs 154-176. Moreover,

24  both databases are so replete with errors that, by ICE's own account, it finds errors

25  in both databases 30% of the time it issues detainers. AMFs 131, 132-147. ICE's

26  sole reliance on incomplete and inaccurate databases has led to extraordinary

27  numbers of false arrests and unreasonably jeopardized the liberty of citizens and

28  non-citizens alike. AMF 148. Between October 2010 and February 2016, ICE took

custody of only 31% of the subjects of detainers issued within the ICE Los Angeles Area of Responsibility (AMF 184), suggesting that ICE did not in fact have probable cause to arrest and detain most of the people it subjected to detainers. For a more detailed discussion, please see the *Gonzalez*-Plaintiffs' Motion for Summary Adjudication, Dkt. 247-1.

### D. CALCULATION OF RELEASE DATES

Contrary to the County's assertion, Plaintiffs' calculations of over-detentions are based solely on the time inmates remained incarcerated after their sentence *expired* (i.e. after their statutory maximum release date), not the time inmates remained incarcerated after they would have become eligible for early release. *See* Dkt. 258, Sealed Decl. of Brian Kriegler, p. 10 (scheduled release date refers to the statutory maximum release date).

### III. ARGUMENT

Defendants argue that class members' detentions were lawful because: (1) they were based on ICE's determination of probable cause of removability; and, (2) authorized by federal regulation. These arguments completely miss the mark. ICE's probable cause of removability cannot justify an arrest by the LASD in the absence of state law authorizing arrests based on civil immigration violations. Because California law provides no such authority, probable cause of removability (as opposed to a crime) cannot support an arrest by the LASD. A federal regulation cannot authorize an arrest by local law enforcement officers in excess of their authority under state law. Moreover, the regulation on which Defendants rely does not even *purport* to authorize detention (for any period of time, much less for longer than 48 hours). For these reasons, it is immaterial whether ICE detainers are supported by probable cause of removability.

Even if probable cause of removability were sufficient to justify an arrest, the LASD could not rely on ICE's determination of probable cause except where the collective knowledge doctrine applies. The collective knowledge doctrine applies

8

only if LASD and ICE were engaged in a joint investigation of civil immigration violations. Here, that was not the case. In addition, the collective knowledge doctrine would apply only where ICE communicates an appropriate request or order to the LASD, which, in the case of "investigative detainers" did not occur because investigative detainers abjured the existence of probable cause.

The County's liability for detaining members of the Post-48 Hour Gerstein class turns on whether the Fourth and Fourteenth Amendments require some probable cause review—judicial or otherwise—within 48 hours of arrest on a detainer. Though Defendants do not contest that some probable cause review is required, they contest whether such a review must occur within 48 hours *including* weekends and holidays. Because the LASD permitted detentions of 48 hours excluding weekends and holidays, members of the Post-48 Hour Gerstein were regularly detained for up to seven days without such a review. The County's reliance on 8 C.F.R. 287.7(d) as authorization for such lengthy detentions is misplaced. Because this regulation does not authorize detentions at all, it cannot authorize detentions of longer than 48 hours.  .

## A.     THE LASD DETAINED CLASS MEMBERS WITHOUT AUTHORITY

After an inmate becomes due for release on all criminal matters, incarceration on an immigration detainer is equivalent to a new seizure. *Morales v. Chadbourne*, 793 F.3d 208, 215-218 (1st Cir. 2015) (under "clearly established" law, the Fourth Amendment applies to immigration detainers); *Moreno v. Napolitano*, 213 F.Supp.3d 999, 1005(N.D. Ill. 2016) (DHS concedes "…that being detained pursuant to an ICE immigration detainer constitutes a warrantless arrest."); *Galarza v. Szalczyk*, 2012 WL 1080020, at *10, * 14 (E.D. Pa. Mar. 30, 2012) (detention pursuant to an immigration detainer is a seizure within the meaning of the Fourth Amendment), *rev'd in part on other grounds*, 745 F.3d 634 (3d Cir. 2013); *Mendia v. Garcia*, 2016 WL 2654327, at *5-6 (N.D. Cal. May 10, 2016) (immigration detainer triggers Fourth Amendment protections); *Miranda-Olivares v. Clackamas*

9

1   *County*, 2014 WL 1414305, at * 9-10 (D. Or. Apr. 11, 2014) (the "continuation of
2   [plaintiff's] detention based on the ICE detainer" constituted a "new arrest, and must
3   be analyzed under the Fourth Amendment"; awarding summary judgment to
4   plaintiff detainee).

5       It is well established that state law determines the arrest authority of state
6   officers. *See Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S. Ct. 2627, 61 L. Ed. 2d
7   343 (1979) ("Whether an officer is authorized to make an arrest ordinarily depends,
8   in the first instance, on state law."); *Ker v. State of Cal.*, 374 U.S. 23, 37 (1963)
9   ("[T]he lawfulness of arrests for federal offenses is to be determined by reference to
10  state law insofar as it is not violative of the Federal Constitution."). If state law does
11  not affirmatively grant authority to make an arrest, the arrest is unlawful. *See, e.g.,*
12  *Mercer v. Dep't of Motor Vehicles*, 53 Cal. 3d 753, 769, 809 P.2d 404 (1991)
13  (holding that warrantless arrest for a misdemeanor offense committed outside
14  arresting officer's presence was unlawful because California law authorizes
15  misdemeanor arrests only for offenses committed in an officer's presence).

16      State law is the touchstone for the arrest authority of state officers even where
17  it comes to arrests for federal offenses. The Ninth Circuit made this clear in its
18  decision in Gonzales v. City of Peoria, 722 F.2d 468, 475 (9th Cir. 1983), *overruled*
19  *on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).
20  There, the Court assessed the lawfulness of an arrest by local police in Peoria,
21  Arizona for unlawful entry into the United States in violation of a federal criminal
22  statute, 8 U.S.C. § 1325. *Id.* at 474-77. After first concluding that federal law
23  permitted local police to arrest for § 1325 violations, the Court next went on to ask,
24  "whether state law grants Peoria police the affirmative authority to make arrests
25  under those statutes." *Id.* Only after determining that state law authorized the arrest
26  did the Court uphold it. *Id.*

27      California law does not authorize peace officers to make arrests for civil
28  immigration violations. The arrest power of California law enforcement officers is

enumerated by state statute, which authorizes warrantless arrests only in specific, enumerated circumstances. These circumstances do not include civil immigration purposes.[2] Because LASD cannot detain persons for civil immigration violations, the LASD has no authority to hold people on immigration detainers, which are based on evidence of removability, rather than any criminal offense.

The principle that the parameters of state arrest authority are set by state law is not a technicality. Rather, it is fundamental to our federalist system of government. This system preserves states' authority to set the powers of their own officers. *See, e.g., Koog v. United States*, 79 F.3d 452, 460 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials."). If the federal government could subvert states' control over their own officers simply by asking state officers to make arrests that the state has not seen fit to authorize, it would raise serious commandeering concerns under the Tenth Amendment. *Cf. Printz v. United States*, 521 U.S. 898, 922, 928-32 (1997) (holding that the Tenth Amendment prevents the federal government from "impress[ing] into its service— and at no cost to itself—the police officers of the 50 States").

---

2 Penal Code § 836(a) authorizes warrantless arrests where (1) "[t]he officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence," (2) "[t]he person arrested has committed a felony, although not in the officer's presence," (3) "[t]he officer has probable cause to believe that person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." Cal. Pen. Code § 836(a)(1)-(3). Violation of civil immigration laws does not constitute a "public offense" for the purpose of §836. The Penal Code defines "public offense" as including felonies, misdemeanors, and infractions, Cal. Pen. Code § 16, and as "an act committed or omitted in violation of a law forbidding or commanding it, and to which is annexed, upon conviction, either of the following punishments: 1. Death; 2. Imprisonment; 3. Fine; 4. Removal from office; or, 5. Disqualification to hold and enjoy any office of honor, trust or profit in this State." Cal. Pen. Code §15.

11

Notably, Congress has recognized this federalism limitation in the immigration context. In the narrow circumstances where Congress has permitted state officers to participate in civil immigration enforcement,[3] it has repeatedly affirmed that the authority of state officers remains constrained by state law. *See* 8 U.S.C. § 1357(g)(1) (permitting federal-state agreements authorizing state and local officials to perform immigration enforcement functions, but only "to the extent consistent with State and local law."); 8 U.S.C. § 1252c (granting authority to state and local law enforcement to make arrests based on certain administrative immigration warrants but only "to the extent permitted by relevant State and local law."); 8 U.S.C. § 1103(a)(10) (in the event of a mass influx permitting the Attorney General to delegate enforcement authority to a local officer, but only "with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving." ); 8 U.S.C. § 1324(c) (granting authority to state and local law enforcement officials "whose duty" is to enforce criminal laws.").

### 1. *8 C.F.R. § 287.7 Does Not Alter This Analysis*

Despite controlling precedent establishing that the parameters of LASD's arrest authority are set by state law, the County points to no provision of California law that gives LASD authority to hold class members on detainers. Instead, the County relies on a federal regulation, 8 C.F.R. § 287.7(d) to authorize class members' detention. However, even assuming, *arguendo*, 287.7(d) permitted detention as a matter of federal law, that would not render LASD's detention of class members' lawful. Rather, as described above, this Court would still have to

---

3 It is well-settled that civil immigration arrests by local law enforcement officers are preempted except in specific, narrow circumstances identified by Congress. *Arizona v. United States*, 567 U.S. 387, 408-09 (2012).

12

"consider whether state law grants [LASD] the affirmative authority to make arrests under [civil immigration] statutes," which it does not. *Gonzales*, 722 F.2d at 475.

In any event, § 287.7(d) does not even purport to authorize class members detention under federal law. To the contrary, federal courts and ICE itself have rejected the idea that § 287.7(d) authorizes detentions of any duration beyond the time an individual would otherwise be released from criminal custody. *See Villars v. Kubiatowski*, 45 F.Supp.3d 791, 807(N.D. Ill. 2014) ("[N]owhere does [§ 287.7(d)] authorize the detention of an alien for 48 hours *after local custody over the detainee would otherwise end*.") (emphasis in original). Instead, § 287.7(d) merely authorizes *ICE* to *request* detention on a detainer, leaving it up to the receiving agency to determine whether it has authority to detain the individual as well as whether to comply with the detainer request as a matter of discretion. *See, e.g., Galarza*, 745 F.3d at 639 640 (holding that the plain language of § 287.7(d) "merely authorizes the issuance of detainers as *requests*."). ICE's 30(b)(6) witness confirmed this interpretation, testifying that an immigration detainer issued pursuant to 287.7(d) does not authorize a law enforcement agency to continue to detain a person; rather, "that would be up to the individual law enforcement agency to determine what authority or right they have to hold an individual . . ." AMF 103. In fact, the regulations themselves make clear that § 287.7(d) is intended only to provide "internal guidance" to DHS and "do[es] not, and [is] not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal"— including, necessarily, the right to make an arrest. 8 C.F.R. § 287.12.

Any other interpretation of § 287.7(d) is untenable. If the regulation were interpreted as an affirmative source of authority for detention on detainers, it would expand state and local civil immigration arrest authority well beyond the "limited circumstances in which [Congress has provided that] state officers may perform the functions of an immigration officer," and even beyond the arrest authority of ICE

13

1   itself. *Arizona*, 567 U.S. at 408–09 (listing statutes authorizing state and local arrests
2   for civil immigration offenses, none of which permit detaining a person on an
3   immigration detainer); *id.* at 408 (holding unconstitutional state law that would
4   "provide state officers even greater authority to arrest aliens on the basis of possible
5   removability than Congress has given to trained federal immigration officers"). But
6   a regulation obviously cannot grant arrest authority that has been withheld by
7   statute. Indeed, federal courts have previously held counties liable for detaining
8   individuals on immigration detainers because the detention was outside the limits of
9   ICE's own statutory arrest authority. *See Orellana v. Nobles Cty.*, No. CV 15-3852
10  ADM/SER, 2017 WL 72397, at *9 (D. Minn. Jan. 6, 2017) (holding that County's
11  arrest of Plaintiffs' on an immigration detainer was unauthorized in part because it
12  exceeded the limits of ICE's own warrantless arrest authority); *see also Gonzalez*
13  Pls. Motion for Summary Judgment, Doc. 247-1 at 21-25 (arguing that arrests on
14  detainers exceed ICE's warrantless arrest authority).

15      Finally, interpreting § 287.7(d) to authorize detention on detainers would be
16  inconsistent with the Immigration and Nationality Act (INA), which treats detainers
17  not as requests for detention, but rather as mechanisms by which "[s]tate officials
18  can . . . assist the Federal Government by responding to requests for information
19  about when an alien will be released from their custody. *Arizona*, 567 U.S. at 410
20  (citing 8 U.S.C. §1357(d), the only provision of the INA that mentions detainers);
21  *see also Galarza*, 745 F.3d at 641 ("[T]he Supreme Court has noted that § 1357(d)
22  is a request for notice of a prisoner's release, not a command (or even a request) to
23  LEAs to detain suspects on behalf of the federal government."); *Moreno*, 213
24  F.Supp.3d at 1005 n.3 (explaining that "detainer' in the [Immigration and
25  Nationality Act] simply means a request to a local law enforcement agency for
26  information about an inmate's release date").
27
28

14

**2.**   ***Because California Law Enforcement Have No Arrest***
***Authority for Civil Immigration Violations, ICE's Probable***
***Cause Determinations Cannot Justify An Arrest***

ICE's probable cause determinations do not automatically impute to the
LASD. Probable cause of removability – as opposed to a crime – does not justify an
arrest by local law enforcement. In the absence of state law authorizing arrests for
civil immigration violations, local law enforcement may only arrest upon probable
cause *of a crime*. *Arizona*, 132 S. Ct. at 2506 (Because "it is not a crime for a
removable alien to remain present in the United States…[i]f the police stop someone
on nothing more than possible removability, the usual predicate for an arrest is
absent."); *Santoyo v. U.S*, No. 5:16-CV-855-OLG, June 5, 2017, p. 12 (W.D. Tex.
June 5, 2017) (rejecting argument that County officials were entitled to rely upon
ICE's probable cause determination because "ICE's assessment of probable cause
was based on a determination that Plaintiff was likely removable, not that he had
committed a criminal offense), *see*, Decl. Lindsay Battles Ex. HH; *Mercado v.
Dallas County, Texas*, ---F.Supp.3d ---, 2017 WL 169102, *6-9 (N.D.Tex. Jan. 17,
2017) (holding that Plaintiffs adequately alleged claim that their arrests on
immigration detainers were unlawful because arrests by local law enforcement
agencies must be supported by probable cause of a *criminal* offense, not a civil
immigration violation); *People ex rel. Swenson v. Ponte*, 994 N.Y.S.2d 841 (N.Y.
Sup. Ct. 2014) (holding that arrest on immigration detainer was unlawful because it
exceeded arrest authority under state and local law); *see also*, *Gonzales*, 722 F.2d at
475 (even if federal law gives state LEAs discretion to arrest for a federal offense,
the arrest is lawful only where state law actually authorizes the arrest) (citing *Ker*,
374 U.S. at 37.)

Even if probable cause of removability could justify arrests by the LASD,
ICE's probable cause determination imputes to local law enforcement **only** where
the collective knowledge doctrine applies. The collective knowledge doctrine

15

1 | supports arrest or detention when one officer (or agency) knows facts constituting
2 | reasonable suspicion or probable cause sufficient to justify a warrantless arrest. *U.S.*
3 | *v. Ramirez*, 473 F.3d 1026, 1036 (9th Cir. 2007). It applies only where there is
4 | communication or cooperation between the ICE personnel who make the probable
5 | cause determination and the County officials who processed the request. *Santoyo v.*
6 | *U.S.*, at pp. 12-13 (emphasizing the absence of any evidence indicating the "identity
7 | of any individual within ICE [who] reached the probable cause determination, the
8 | information that formed the basis for that determination, or when it was reached").
9 | Here, the LASD does not contend that custodial personnel who effectuated
10 | warrantless arrests pursuant to ICE detainers engaged in any cooperation or
11 | communication with ICE personnel who issued the detainers, nor is there any
12 | evidence to support such an assertion.

13 |      The lack of any communication between LASD and ICE distinguishes this
14 | case from *Mendoza v. ICE*, 849 F.3d 408 (8th Cir. 2017), on which the County relies
15 | heavily. Mendoza, 849 F.3d at 413-14 (describing communication between local
16 | officers and ICE and investigation by local officers). Instead, LASD's cooperation
17 | with ICE is more akin to that described in *Santoyo*, where the Court found the
18 | collective knowledge doctrine did not apply. *Santoyo*, Slip. Op. at pp. 12-13
19 | (emphasizing the absence of any evidence indicating the "identity of any individual
20 | within ICE [who] reached the probable cause determination, the information that
21 | formed the basis for that determination, or when it was reached"). Because LASD
22 | and ICE were not engaged in any joint investigation and because the only
23 | communication between LASD and ICE consisted of a facially invalid request from
24 | ICE, the collective knowledge doctrine does not apply and ICE's probable cause
25 | determination cannot impute to LASD.
26 |
27 |
28 |

16

### 3. Holding Inmates on Investigative Detainers Violated the Fourth Amendment

Once again assuming, arguendo, that LASD were generally authorized to hold people on immigration detainers, the detention of Investigative Detainer class members was still unlawful, because LASD lacked probable cause for their detention. This is so regardless of whether ICE itself had probable cause to issue investigative detainers. ICE's probable cause determination can impute to—and authorize an arrest by—local law enforcement only where the collective knowledge doctrine applies. But, as recently held by the federal district court for the Western District of Texas, the collective knowledge doctrine does not apply in the immigration detainer context. Santoyo, Slip. Op. at pp. 12-13

The collective knowledge doctrine applies only where the requesting agency communicates an *"appropriate order or request"* to another agency. *Ramirez*, 473 F.3d at 1037. Here, undisputed evidence establishes that the LASD honored thousands of immigration detainers that requested detention on the sole grounds that *an investigation had been initiated*, facially communicating that ICE had not yet acquired evidence to support probable cause of removability. A request for detention that affirmatively disclaims a sufficient legal basis for detention does not constitute an "appropriate request or order" sufficient to invoke the collective knowledge doctrine. *See Morales v. Chadbourne*, 996 F.Supp.2d 19, 29 (D.R.I. 2014) *aff'd in part, dismissed in part*, 793 F. 3d 208 (1st Cir. 2015) ("One needs to look no further than the detainer itself to determine that there was no probable cause to support its issuance" since it seeks a hold "solely because an investigation of her status…had been initiated."); *Miranda-Olivares*, 2014 WL 1414305, at *11 ("[T]he ICE detainer alone did not demonstrate probable cause to hold Miranda–Olivares. It stated only that an investigation 'has been initiated' to determine whether she was subject to removal from the United States.'"); *see also, Arizona*, 567 U.S. at 413 ("Detaining individuals solely to verify their immigration status would raise constitutional

17

1   concerns."); *U.S. v. Sholola*, 124 F.3d 803 (7th 1997) ("*Gerstein* and its progeny . . .

2   prohibit law enforcement from detaining a defendant to gather evidence to justify

3   his arrest . . ."); *U.S. v. Davis*, 174 F.3d 941, 945 (8th Cir. 1999); *Willis v. City of*

4   *Chicago*, 999 F.2d 284, 288-289 (7th Cir. 1993).

5   **B.    DETENTIONS LONGER THAN 48 HOURS WERE UNLAWFUL**

6       ***1.    Detentions of Longer Than 48 Hours Violated the Fourth***

7   ***Amendment***

8       Even assuming, *arguendo*, that LASD were generally authorized to hold

9   people on immigration detainers, the detention of Post-48 Hour *Gerstein* class

10  members was still unlawful because LASD did not obtain third-party review of

11  probable cause from anyone—including an executive officer—within forty-eight

12  hours.[4]  The County argues—and this Court recently held—that *Gerstein's*

13  requirement for a *judicial* review of probable cause does not apply to ICE's

14  determinations of probable cause of removability.[5] Order on Pls.' Mot. for Partial

15  Summary Judgment, Doc. 264 at 18-19. But both the County and this Court also

16  agree that at least *some* probable cause review by ICE itself is required. *See* Order,

17  Doc. 264 at 18 (finding that "it is not unconstitutional under the Fourth Amendment

18  for the Legislature to delegate a probable cause determination to an executive

19  officer, such as an ICE agent . . . ."); Defs' Mot. at 20 (arguing that "ICE agents are

20  authorized to . . . review their own probable cause determinations"); *see also* 8

21  C.F.R. § 287.3 (providing for a charging and custody determination by an

22  immigration officer within 48 hours of warrantless immigration arrest).

23

24  4 Plaintiffs further reserve the right to argue on appeal that the Fourth Amendment requires

25  a review of ICE's probable cause determinations by a judicial official, such as a federal
    judge, magistrate, or immigration judge, within 48 hours for individuals held by local law

26  enforcement on immigration detainers. It is unnecessary to reach that issue since it is
    undisputed that LASD does not obtain any probable cause review, judicial or otherwise.

27

28

1　　　　It is undisputed that no such review occurred while ICE-detainer inmates
2　remained in LASD custody. ICE acknowledges that no probable cause review
3　occurs until it takes custody, and often does not occur for up to 48 hours after ICE
4　takes custody, in addition to the time (if any) that the LEA detained the individual
5　based on the detainer. Dkt. 225, DHS Opp. to *Gonzalez*-Plaintiffs' MSJ, p. 4:2-4:18;
6　*see also*, AMFs 24-28 (the LASD was aware that no probable cause determination
7　occurred within 48 hours). As a result, class members were regularly held for up to
8　*seven days* (five days in LASD custody over a holiday weekend, plus an additional
9　two days in ICE custody) before receiving *any* probable cause review at all. The fact
10　that LASD failed to obtain a probable cause review renders class members'
11　detentions unlawful.
12　　　　The claims of the *Roy* Post-48 Hour *Gerstein* class differ from those of the
13　*Gonzalez* Judicial Determination Class in two significant respects. First, the dispute
14　raised by the Post-48 Hours *Gerstein* class is precisely that class members "were
15　subject to a lengthy unauthorized detention" of up to seven days—a question this
16　Court found was not at issue in *Gonzalez*. Order, Doc. 264 at 16. Second, *Roy*
17　Plaintiffs challenge the detention authority of the LASD, not ICE. Even assuming
18　ICE is not constitutionally required to obtain a judicial probable cause determination
19　before holding someone over 48 hours, LASD's detention authority remains
20　constrained by the Supreme Court's decisions in *Gerstein*, 420 U.S. 103, 420 U.S.
21　103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975) and *Cty. of Riverside v. McLaughlin*, 500
22　U.S. 44 (1991), which require a judicial review of probable cause within 48 hours of
23　arrest. *Gerstein v. Pugh*, 420 U.S. 103 (1975);; *see also Mercado*, 2017 WL 169102,
24　at *6-9 *v. Dallas County, Texas*, ---F.Supp.3d ---, 2017 WL 169102, *6-9 (N.D.Tex.
25　Jan. 17, 2017) (distinguishing between arrest authority of local criminal justice
26　agencies and ICE).
27　　　　The County also argues that its detention of Post-48 Hour Gerstein Class
28　Members was authorized by 8 C.F.R. § 287.7(d). But, as described above, 8 C.F.R.

1   § 287.7(d) does not purport to authorize detention for any time period. Nor, of

2   course, does 287.7(d) "alter or amend the contours of the Fourth or Fourteenth

3   Amendments of the United States Constitution." *Villars*, 45 F. Supp. At 807.

4   LASD's practice of detaining persons for more than 48 hours without any probable

5   cause review, including by ICE itself, violated Fourth Amendment.

        **2.      Detentions of Longer than 48 Hours Violated Due Process**

6

7          It is also well-established that detentions must comport with the Fifth

8   Amendment's Due Process Clause. *See* U.S. Const. amend. V, full text

9   (guaranteeing that no person shall "be deprived of life, liberty, or property, without

10  due process of law"). To determine whether the detention of Post-48 Hour *Gerstein*

11  class members comported with Due Process, the Court must consider "[f]irst, the

12  private interest that will be affected by the official action; second, the risk of an

13  erroneous deprivation of such interest through the procedures used, and the probable

14  value, if any, of additional or substitute procedural safeguards; and finally, the

15  Government's interest, including the function involved and the fiscal and

16  administrative burdens that the additional or substitute procedural requirement

17  would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

18         The private interest at issue here is unquestionably significant. As the

19  Supreme Court has explained, "[t]he consequences of prolonged detention may be

20  more serious than the interference occasioned by arrest. Pretrial confinement may

21  imperil the suspect's job, interrupt his source of income, and impair his family

22  relationships." *Gerstein*, 420 U.S. at 114. Despite the seriousness of the interest at

23  stake, the procedures used to hold individuals on immigration detainers entail a high

24  risk of erroneous deprivation. "The essence of due process is the requirement that a

25  person in jeopardy of serious loss (be given) notice of the case against him and

26  opportunity to meet it." *Mathews*, 424 U.S. at 348 (internal quotation marks and

27  citation removed). Yet it was not until several years after this litigation was filed,

28  that LASD even begin to notify class members that any detainer had been issued

against them. AMFs 149-151. And the only procedure currently available to individuals who wish to challenge their detainers is to call a toll free number that may not even be accessible from County jail and speak to a representative of ICE—the very agency that has requested their detention. *Id.* These procedures utterly fail to provide any meaningful protection, which is generally defined as a hearing before a neutral, detached official. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[T]he root requirement of the Due Process Clause [is] ... that an individual be given an opportunity for a hearing before he is deprived of any significant [liberty] interest."); *Shadwick v. City of Tampa*, 407 U.S. 345, 349-50, 92 S. Ct. 2119, 32 L. Ed. 2d 783 (1972) (holding that a meaningful hearing is necessarily a proceeding before a neutral, detached magistrate).

Finally, the government's interest in detaining class members for civil immigration violations would not be substantially burdened by requiring basic procedural safeguards. LASD already maintains procedures for ensuring that other inmates held on warrantless arrests are either provided a probable cause review or released within 48 hours. AMF 28. It has pointed to no reason why the burden of providing such procedures to individuals held on ICE detainers would be prohibitive, or why its interest in detaining persons for civil immigration violations somehow outweighs its interests in detaining persons for criminal offenses such that providing comparable procedural protections would be overly onerous.

**D.  DEFENDANTS MISCONSTRUE PLAINTIFFS' CLAIMS REGARDING THE RIGHT TO POST BAIL**

Defendants misconstrue Plaintiffs' liability theories for the no-bail class. Liability does not hinge on whether the LASD specifically communicated to any individual that they could not post bail due to an ICE detainer, but rather, whether LASD's practice of characterizing all ICE detainers as "no bail" holds effectively denied ICE-hold inmates the right to post bail. For a more complete discussion of

1  Plaintiffs' legal theories regarding the bail class, see Dkt. 240, *Roy*-Plaintiffs' Mot.
2  Partial Summary Adjudication.
3      The Bail Class plaintiffs, including Alain Martinez-Perez, had an interest in
4  release upon posting bail, which was established and reinforced by the mandatory
5  provisions of California law imposing a mandatory duty on LASD to release on bail
6  any arrestee or inmate who meets the statutory conditions for bail. *See, e.g.*, Cal.
7  Const., Art. 1, section 12; Cal. Penal Code §§ 1268, 1269b, 1295(a); *Shakespeare v.*
8  *City of Pasadena*, 40 Cal. Rptr. 863, 869 (Cal. Ct. App. 1964) ("The duty to release,
9  the statutory conditions having been met, is mandatory (Pen.Code, § 1295), and
10  detention thereafter unlawful."); *Moore v. City & Cnty of San Francisco*, 5 Cal.
11  App. 3d 728, 736-37 (Cal. Ct. App. 1970) (same). Preventing individuals from
12  posting bail based on immigration status violates substantive due process. *See*
13  *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 775 (9th Cir. 2014) (Arizona law
14  denying all undocumented immigrants the right to post bail violated substantive due
15  process) (*en banc*).
16      When a detainee is not confined as a result of a criminal conviction, the due
17  process clause requires the nature and duration of confinement to bear a reasonable
18  relation to the purpose for which the individual has been committed. *Youngberg v.*
19  *Romeo*, 457 U.S. 307, 320-21 (1982). *See also, e.g., Oviatt v. Pearce*, 954 F.2d
20  1470, 1474 (9th Cir.1992) ("[an individual has a liberty interest in being free from
21  incarceration absent a criminal conviction") (citation omitted). Here, the nature and
22  duration of confinement was not reasonable because immigration detainers provided
23  no independent legal justification for holding inmates otherwise entitled to post bail
24  or be released. The I-247 form expressly states: "This detainer arises from DHS
25  authorities and should not impact decisions about the alien's bail, rehabilitation,
26  parole, release, diversion, custody classification, work, quarter assignments, or other
27  matters." Release on bail is a form of release from criminal custody clearly
28  contemplated by the federal detainer regulations. *See, e.g., Rivas v. Martin*, 781 F.

22

1   Supp. 2d 775, 781 (N.D. Ind. 2011) ("the language of the detainer and of 8 C.F.R. §

2   287.7 made it clear that defendants could only hold Rivas for an additional 48 hours

3   under the detainer" after she posted bond); *Galarza*, 2012 WL 1080020 at*20

4   ("Plaintiff became a person 'not otherwise detained by a criminal justice agency'

5   when his bail was posted."). The County's practice of rejecting bail on behalf of

6   inmates with ICE detainers was without lawful basis. *Miranda-Olivares*, 2014 WL

7   1414305, at *10.[6]*See also, e.g., Ilac v. Tenn*, No. CIV. 12-00316 ACK, 2013 WL

8   4499386, at *8 (D. Haw. Aug. 20, 2013) (claim that delay in admission to bail after

9   bail was set violates the due process clause of the Fourteenth Amendment, citing

10  *Dodds v. Richardson*, 614 F.3d 1185, 1190 (10th Cir.2010) and *Campbell v.*

11  *Johnson*, 586 F.3d 835, 840 (11th Cir.2009)); *Brass v. County of Los Angeles*, 328

12  F.3d 1192, 1202 (9th Cir.2003) (due process claim for failure to timely release but

13  issue not reached because it was not established that the County's custom and

14  practice caused plaintiff unreasonable delay in release); *Barnes v. District of*

15  *Columbia*, 793 F. Supp. 2d 260, 278 (D.D.C. 2011) (enforcement of ordinance

16  requiring that inmates not be released between 10:00 p.m. and the next morning

17  violated due process rights of persons otherwise entitled to release).

18       Some courts have alternatively analyzed failures to release inmates after they

19  became entitled to release under the Fourth Amendment. *See, e.g., Arline v. City of*

20  *Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla. 2005); *Powell v. Barrett*, 376

21  F.Supp.2d 1340, 1352 (N.D.Ga. 2005); *Miranda-Olivares*, 2014 WL 1414305 at

22  **9-11 (failure to release ICE detainees on bail violated the Fourth Amendment;

23  ICE detainer was "a subsequent and new 'prolonged warrantless, post-arrest, pre-

24

25

26  ───────────────

    6 *Miranda-Olivares* rejected Plaintiffs' claim that the denial of bail violated due process,
27  instead resolving the case on Fourth Amendment grounds; it did not address cases,
    including in the Ninth Circuit, finding unreasonable over-detentions to violate due process.
28

23

1   arraignment custody'"). Whether under the due process clause or the Fourth

2   Amendment, LASD's bail policies and practices were unconstitutional.

3   **E.   PLAINTIFFS ASSERT VIABLE CLAIMS UNDER CIVIL CODE § 52.1**

4       The County's reliance on discretionary immunity is misplaced. In *Johnson v.*

5   *State of California*, 69 Cal. 2d 782 (Cal. 1968), the California Supreme Court

6   explained that discretionary immunity under §820.2 was limited, concluding that

7   while discretionary immunity applies to "basic policy" decisions, it does **not**

8   immunize ministerial actions implementing such basic policy decisions. *Id.* at 793-

9   797; *see also Lopez v. Southern Cal. Rapid Transit Dist.*, 40 Cal.3d 780, 793 (Cal.

10  1985). Thus, it makes no difference whether LASD policy sanctioned unlawful

11  arrests pursuant to ICE detainers. Even if supervisors have discretionary immunity

12  for promulgating unconstitutional policies concerning ICE detainers, employees

13  who carried out the unlawful policies in their ministerial capacity are not immune

14  because "[i]mmune discretionary acts involve planning and policy making whereas

15  unprotected ministerial acts involve operational functions." *Doe 1 v. City of*

16  *Murrieta*, 102 Cal.App.4th 899, 912 (Cal. Ct. App. 2002).[7] Further, California

17  courts have expressly recognized that unlawful arrest does not constitute a "basic

18  policy decision," but rather, an operational decision, to which Government Code

19  820.2 does not apply. *Gillian v. City of San Marino*, 147 Cal.App.4th 1033, 1051, *as*

20  *modified on denial of reh'g* (Cal. Ct. App. 2007) (discretionary immunity does not

---

7 The LASD is liable for its employees' non-immune tortious acts whether based on
statute or common law. Govt. Code §§815.2(a), 820(a). An entity is liable for the acts of
its employees even when they are not parties or their identity is not known. *Perez v. City of
Huntington Park*, 7 Cal.App.4th 817, 820 (Cal. Ct. App. 1992). Identification of a specific
employee tortfeasor is not required. *County of Los Angeles v. Superior Court*, 102 Cal.
App. 4th 627, 648 (Cal. Ct. App. 2002); Legislative Committee comment to Govt. Code
§815.2, supra.

1   apply to warrantless arrest unsupported by probable cause).[8] Accordingly, even if

2   the County's policy decisions to honor an ICE detainer as though it were a lawful

3   basis to detain inmates, or to deny bail, was entitled to discretionary immunity, jail

4   staff implementing those same policy decisions is not entitled to such immunity.

5       Contrary County's assertion, Plaintiffs have established coercion, separate

6   from the challenged over-detentions, with evidence that the LASD falsely recorded

7   immigration detainers in its databases as mandatory holds (similar to warrants,

8   parole holds, etc.) despite the fact that detainers provided no lawful basis for

9   detention. The County does not dispute that it (falsely) communicated to employees

10  and agents that ICE detainers authorized and required class members to be detained

11  through entry of the hold in their computer system. (SAC ¶¶ 197, 205.) The coercive

12  nature of the LASD's data entries is reinforced by the use of the "No Bail"

13  designation within LASD's internal data systems and on LASD's public portal, both

14  of which communicated (incorrectly) that inmates with immigration detainers were

15  not entitled to post bail, resulting in their over-detention. This Court has previously

16  ruled that deceptive record-keeping practices would be sufficient to establish

17  coercive conduct independent of the over-detention to plead a cause of action under

18  section 52.1. *See* Roy v. Cty. of Los Angeles, 2015 WL 12582637, at *6-8 (C.D.

19

20

21

22  8 See also, *Ogborn v. City of Lancaster, 101 Cal. App. 4th 448, 461-62 (Cal. Ct. App.
    2002)* ("city code enforcement officer performed ministerial action in entering tenants'

23  rented home and removing them before demolition, and thus did not have immunity from
    their claims for trespass and conversion."; because the code enforcement officer was

24  merely implementing the nuisance abatement program, his presence at the property and

25  order to demolish were "subsequent ministerial actions in the implementation of the basic
    decision."); *Ma v. City and County of San Francisco*, 95 Cal. App. 4th 488, 492 (Cal. Ct.

26  App. 2002) (§820.2 did not immunize the county from its duty of care for the "manner in

27  which [] 911 emergency service procedures were implemented," even if its basic design
    and content of were immunized).

28

Cal. Nov. 20, 2015).[9] Because no facts are in dispute, this court's prior ruling on this claim requires the grant of summary judgment in Plaintiffs' favor.

### F. DEFENDANTS ASSERT NO FACTS TO ESTABLISH THAT PLAINTIFFS' INJUNCTIVE RELIEF CLAIMS ARE MOOT

This Court has already rejected Defendants' mootness defense on the basis that Defendants have not "met their 'heavy burden' of establishing that the challenged conduct here cannot reasonably be expected to resume." Dkt. 184, 9/9/16 Class Certification Order (emphasizing that the County has not "establish[ed] that there is no *possibility* that the LASD could change its policy to once again allow extended detainer."). The County's motion is devoid of any reason to alter this conclusion. In support of its position, the County relies exclusively on the self-serving declaration of Chief Joanne Sharp, whose testimony utterly fails to establish "no possibility" that former practices will resume, *see* Dkt. 242, p. 25. To the contrary, Sharp expresses strong opposition to any relief that would prohibit the LASD from honoring immigration detainers, suggesting a significant likelihood that the LASD would revert to previous practice in the absence of a judicial ruling. She in fact argues, contrary to the position of the California Attorney General, that the LASD's *failure* to cooperate with ICE would undermine public safety. As the California Attorney General has asserted, the opposite is true. Local law enforcement's entanglement with federal immigration enforcement destroys trust with immigrant communities and discourages their cooperation with police. Battles 7/7/17 Declaration, Ex. GG, pp. 2-6, Amicus Curiae Brief of California, *et al.*, *City and County of San Francisco v. Trump*, cv-00574-WHO, 6/28/17).

---

9 *Julian v. Mission Community Hospital*, 11 Cal.App.5th 360 (Cal. Ct. App. 2017) does not change this analysis; it stands for the uncontroversial proposition that a § 52.1 claim requires evidence of threats, coercion or intimidation, independent from the challenged constitutional violation.

The history of this case underscores the likelihood that the LASD would revert to previous practices absent injunctive and declaratory relief. When this case was filed, in 2012, ICE's practice of issuing immigration detainers based on new, biometrics-based technology, was at its pinnacle. At that time, ICE issued more detainers to the LASD than to any other law enforcement agency—and, in fact, any other state—in the country. Until May 2014, LASD complied with every detainer request—even when ICE expressly disclaimed that there was probable cause to believe the person was deportable—regularly holding people for up to five days.

The LASD's policy did not change until 2014, in response to two significant legal developments. First, the Third Circuit ruled that immigration detainers were voluntary, not mandatory requests. *See Miranda-Olivares*, 2014 WL 1414305, at *9 10, 745 F.3d at 641. Second, a federal district court in Oregon held a county sheriff's department liable for damages for detaining an individual on an investigatory ICE detainer and denying her release on bail. *See Miranda-Olivares, 2014 WL 1414305, at * 9-10 (D. Or. Apr. 11, 2014)*. Following these events, in May 2014, the LASD changed course, abruptly ending its long-standing policy of over incarcerating people on immigration detainers. LASD's decision—which was made in unison with every sheriff's department in the state of California and hundreds of other law enforcement agencies across the country—acknowledged the constitutional and state law problems inherent in a criminal justice agency arresting and detaining someone on the mere say so of an ICE agent, solely for civil immigration purposes, and without any probable cause review.

Following LASD's about-face, and the sea change in state and local policies toward detainers generally, the Obama Administration announced that it would significantly decrease its reliance on immigration detainers, citing "the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment." This approach was subsequently abandoned by the Trump Administration. Instead, the Trump

27

1   Administration has embraced detainers wholeheartedly, even attempting to coerce

2   localities to comply with detainers by threatening to withhold federal funding. A

3   district court in the Northern District of California recently enjoined the federal

4   government from acting on its threats. *See Cty. of Santa Clara v. Trump*, No. 17-

5   CV-00485-WHO, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017). [10] Given the Trump

6   Administration's renewed interest in immigration detainers, and the LASD's

7   expressed interest in cooperating with ICE, there is undeniably a strong possibility

8   that the LASD would resume previous practices in the absence of injunctive relief.

9

10   Dated: July 7, 2017     ACLU of SOUTHERN CALIFORNIA

11                          KAYE, McLANE, BEDNARSKI & LITT, LLP

                         NATIONAL DAY LABORER ORGANIZING NETWORK

12                          NATIONAL IMMIGRANT JUSTICE CENTER

13

14                          By /s/ Lindsay Battles

15                              Attorney for Plaintiffs

16

17   ———————————

    10 In the wake of this renewed emphasis on immigration detainers, numerous state

18   Attorneys General have reaffirmed their understanding that local law enforcement agencies

    that detain people on detainers absent either a judicial warrant or an affirmative grant of

19   state law authority are at risk of liability. See, e.g., Brief of the Commonwealth of

    Massachusetts and the Suffolk County Sheriff, Massachusetts v. Lunn, No. SJC-12276 15-

20   19 (Mass. March 20, 2017), available at https://www.clearinghouse.net/chDocs/public/IM-

    MA-0010-0006.pdf (arguing that LEA compliance with ICE detainer requests must be

21   authorized by state law); State of New York, Attorney General Eric. T. Schneiderman,

    Guidance Concerning Local Authority Participation in Immigration Enforcement and

22   Model Sanctuary Provisions 4-5 (Jan. 2017), at

23   https://ag.ny.gov/sites/default/files/guidance.concerning.local_.authority.

    particpation.in_.immigration.enforcement.1.19.17.pdf (advising that local law enforcement

24   agencies not comply with immigration detainers absent a judicial warrant or probable

    cause of a criminal offense); Maryland Office of Attorney General, Guidance

25   Memorandum: Local Enforcement of Federal Immigration Law: Legal Guidance for

    Maryland State and Local Law Enforcement Officials 7-10 (May 2017), at

26

27   http://www.marylandattorneygeneral.gov/Reports/Immigration_Law_Guidance.pdf

    (same).

28

# EXHIBIT "F"

# EXHIBIT "F"

Flagstaff Justice Court    ⟩ N. San Francisco St. Flagstaff,  Z 86001   928-679-7650

| STATE OF ARIZONA, Plaintiff | DETERMINATION OF RELEASE CONDITIONS AND RELEASE ORDER |
|---|---|
| VS. | ~~Public Defender's Office~~ |
| GUILLERMO TENORIO-SERRANO        04/09/1986 | Case # _____ |
| Defendant (First, MI, Last)                    DOB | Warrant: |

DEFENDANT'S ADDRESS: _60 U. Andra Ave #1010_   PHONE: _92t-310-3?9_
_(600)_

CHARGES: 28-1381A1-DUI (M); 28-1381A2-DUI .08 OR MORE (M); 28-1382A1 EXTREME DUI .15 - .20 (M); 28-1382A2EXTREME DUI > .20 (M)

[✓] Defendant has been advised of the charges and the right to remain silent, counsel, trial, and preliminary hearing if any. The Defendant is ORDERED to comply with the following conditions:

[✓] 1. Appear at the Court marked above on _12 29_ at _7 00_ PM , for **Pre-Trial Conference.**
  [ ] Telephonic Appearance Authorized

[✓] 2. Defendant shall not commit any criminal offense; shall obey all orders of the Court, shall promptly notify the Court of any change of address and shall stay in contact with their attorney, if one is retained or appointed.

[✓] 3. Defendant shall not enter any bars or consume or possess any alcohol beverage, illegal drug, or drug paraphernalia;

[ ] 4. Defendant shall not possess any firearm or other deadly weapon;

[ ] 5. Defendant shall not contact IN ANY MANNER the alleged victim(s): _____

[ ] 7. Defendant shall not go to scene of the alleged crime and/or go to locations as specified here: _____

[✓] 8. Defense Attorney Appointed: Defendant may be required to contribute to the attorney's fees.
  [✓] Public Defender 928-679-7700   [ ] Legal Defender 928-679-7740   [ ] Retain own Attorney   [ ] Other: _____
  [ ] This appointment is for the limited purpose of addressing release issues, which will be discussed at the next hearing.

[✓] 9. Defendant shall not drive without a valid driver's license.

[ ] 10. Defendant MAY NOT leave Arizona.

[ ] 11. Defendant shall submit to a 10 fingerprint/DNA sample, pursuant to A.R.S. § 41-1750.

[ ] 14. Defendant shall have electronic monitoring, if available, (mandatory if charged with a felony offense under Chapters 14 or 35.1 of Title 13).

[ ] 15. Other: _____

[ ] **RELEASE ORDER-** IT IS ORDERED that the above-named Defendant shall be released as checked below.

[✓] **Own Recognizance (O.R.):** Defendant is released on his or her promise to appear in Court for all Court proceedings.

[✓] **Appearance Bond:** Defendant shall be released upon posting a bond in the amount of $ _1 000_ , failure to appear at all court proceedings thereafter may result in a bond forfeiture.  [✓] Secured/Cash   [ ] Cash (Only)   [ ] Unsecured   [ ] Deposit Bond _____%
  [ ] If bond posted, contact _____ Court within 10 days.

[ ] **No Bond:** Hold Defendant without bond pursuant to A.R.S.§ _____

[ ] **Pretrial Services:** If Defendant agrees to terms of supervision, Defendant shall be released to custody of Pretrial Services in lieu of bond. If Defendant violates any term of supervision, Defendant may be returned to custody, subject to release on bond. If held on Bond and posts said Bond, Defendant is to be supervised by Pretrial Services.

[ ] **Third Party Release:** Defendant shall be placed in the custody of _____,
Address: _____   Phone: _____
Who agrees (A) to supervise Defendant in accordance with the conditions of this Order, (B) to use every effort to assure that Defendant appears at all hearings before the Court, and (C) to notify the Court immediately if Defendant violates any condition of release or absconds.

Date: _12/12/2017_        Judge _____        Defendant _____

Upon request to the Court, one week prior to appearance, accommodations will be available pursuant to the Americans with Disabilities Act (ADA)
CC: Court, Prosecutor, Attorney, Defendant, Jail

Approved: 05/03/2017        ✻SPANISH INT.        Version: 3.0

# EXHIBIT "G"

# EXHIBIT "G"

AFFADAVIT

COMES NOW Sarai Tenorio Serrano, being first duly sworn, under oath, and states that the following information is within his personal knowledge and belief:

On December 12, 2017, I heard my brother Guillermo Tenorio Serrano had been detained at the Coconino County Detention Facility, and had been offered bail of $2,000.

Along with my brother Josue Tenorio Serrano, I went to the jail to confirm that if we raised $2,000 we would be able to bail out our brother Guillermo.

However, the officer at the jail told us that our brother Guillermo had an "ICE Hold," which meant he would not be released even if we paid bond.

After we learned this, we decided not to pay the bond.

The above mentioned facts are true and correct to the best of my knowledge.

_Sara, Tenorio_               _02/28/18_
Signature                                    Date

_Dara, Tenorio_
Printed Name


State of Arizona            )
                           )
County of _Coconino_       )


On this _28_ day of _February_ _____, 20 _18_.
          (date)              (month)                        (year)

before me personally appeared _Sarai Tenorio_ _____,
                                        (name of signer)

whose identity was proven to me, on the basis of satisfactory evidence, to be the person whom he/she claims to be, and acknowledged to me that he/she signed the above/attached document.

SARAH WILCE
Notary Public - Arizona
Coconino County
My Comm. Expires Mar 9, 2019

_Sarah Wilce_
Notary Public (signature)

## CERTIFICATE OF TRANSLATION

I, _Victoria Estrella_, am competent to translate from the Spanish language into English. I hereby certify that the following document, to which this certificate is attached, is a true and accurate translation, to the best of my abilities:

_AFFADAVIT_

_Victoria Estrella_
(translator's printed name)

_Victoria Estrella_
(translator's signature)

State of Arizona        )
                        )
County of Coconino      )

On this _28_ day of _February_, 20_18_,
   (date)      (month)      (year)

before me personally appeared _Victoria Estrella_,
      (name of signer)

whose identity was proven to me, on the basis of satisfactory evidence, to be the person whom he/she claims to be, and acknowledged to me that he/she did sign this certificate.

SARAH WILCE
Notary Public - Arizona
Coconino County
My Comm. Expires Mar 9, 2019

_Sarah Wilce_
Notary Public (signature)

# EXHIBIT "H"

# EXHIBIT "H"

IN THE FLAGSTAFF JUSTICE COURT

IN AND FOR THE COUNTY OF COCONINO, STATE OF ARIZONA

STATE OF ARIZONA,
                Plaintiff,               Case No. J-0301-TR-2017007579

vs.                              **AFFIDAVIT**

GUILLERMO TENORIO SERRANO,      Hon. Howard Grodman
                Defendant.

---

AFFIDAVIT OF JOSEPH CABELL BRECKINRIDGE

COMES NOW Joseph Cabell Breckinridge, Immigration Attorney for Defendant GUILLERMO TENORIO SERRANO, and states as follows:

On December 15, 2017, I went to Coconino County Detention Facility (CCDF) hoping to post bond for Guillermo Tenorio Serrano. I had been informed by Mr. Tenorio Serrano's brother that Mr. Tenorio Serrano was being held at CCDF on $2,000 bond. I arrived at the jail with my credit card, ready and willing to post $2,000 bond on Mr. Tenorio Serrano's behalf.

At the jail, I spoke to desk officer Justine Ormsby (Employee 216). Ms. Ormsby told me that Mr. Tenorio Sorano was being held on $2,000 bond.

Ms. Ormsby told me that ordinarily paying such a bond would lead to a detainee's immediate release.

However, Ms. Ormsby also told me that Mr. Tenorio Serrano had an ICE hold, and therefore posting of $2,000 bond would not lead to Mr. Tenorio Serrano's release. Instead, it would trigger a telephone call to ICE, who would then have 48 hours to come and collect Mr. Tenorio Serrano.

Ms. Ormsby told me that under those circumstances, my bond money might not be returned. She said it was an issue I would have to take up with the judge, but that fines and other costs could be deducted from the bond before I could get it back.

Because posting bond would not have freed Mr. Tenorio Serrano, and because I did not want to lose the bond money, I did not post bond for Mr. Tenorio Serrano.

1

The above mentioned facts are true and correct to the best of my knowledge.

Joseph Cabell Breckinrige                    1/21/2018
                                             Date

2

**INDIVIDUAL ACKNOWLEDGMENT**

State/Commonwealth of _Arizona_

County of _Coconino_ } ss.

On this the _21_ day of _January_, _2018_, before me,
Day                    Month              Year

_Sarah Wilce_, the undersigned Notary Public,
Name of Notary Public

personally appeared _Joseph Cabell Breckinridge_,
Name(s) of Signer(s)

☐ personally known to me – OR –

☒ proved to me on the basis of satisfactory
evidence

to be the person(s) whose name(s) is/are subscribed
to the within instrument, and acknowledged to
me that he/she/they executed the same for the
purposes therein stated.

WITNESS my hand and official seal.

_Sarah Wilce_
Signature of Notary Public

SARAH WILCE
Notary Public - Arizona
Coconino County
My Comm. Expires Mar 9, 2019

Place Notary Seal/Stamp Above

Any Other Required Information
(Printed Name of Notary, Expiration Date, etc.)

──────────────── OPTIONAL ────────────────

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this
information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Affidavit_

Document Date: _1-21-18_       Number of Pages: _2_

Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #25936